RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0164p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

KAREEM JACKSON,
     *Petitioner-Appellant* (07-4326),
     *Petitioner-Appellee* (10-4592),

     *v.*

MARGARET BRADSHAW, Warden,
     *Respondent-Appellee* (07-4326),
     *Respondent-Appellant* (10-4592).

Nos. 07-4326; 10-4592

Appeals from the United States District Court
for the Southern District of Ohio at Columbus.
No. 03-00983—Gregory L. Frost, District Judge.

Argued: January 19, 2010

Decided and Filed: June 1, 2012

Before: MERRITT, MARTIN, and CLAY, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Kathryn L. Sandford, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Morgan A. Linn, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Kathryn L. Sandford, Robert K. Lowe, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Morgan A. Linn, Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. In case number 07-4326, Petitioner Kareem Jackson appeals the district court's dismissal of the petition for writ of habeas corpus he filed pursuant to 28 U.S.C. § 2254. Additionally, in case number 10-4592, Respondent appeals an order entered by the district judge in response to a limited remand ordered by

this Court, in which the district court recommended we grant the writ on the basis of *Beck v. Alabama*, 447 U.S. 625 (1980), and *Mitts v. Bagley*, 620 F.3d 650 (6th Cir. 2010), *rev'd sub. nom Bobby v. Mitts*, 131 S. Ct. 1762 (2011). For the reasons set forth below, we **AFFIRM** the district court's original decision in case number 07-4326 denying the petition for writ of habeas corpus, **REVERSE** the district court's order in case number 10-4592, and **DENY** the petition.

## BACKGROUND

The following facts and procedural history were recounted in the Ohio Supreme Court's opinion denying Petitioner's direct appeal in state court. *See State v. Jackson*, 751 N.E.2d 946 (Ohio 2001).

On March 24, 1997, Petitioner, Derrick Boone, Michael Patterson, and a man called "Little Bee" decided to rob an apartment in Columbus, Ohio. Just past midnight on March 25, 1997, Malaika Williamson drove the four men to the target apartment. Inside the apartment were residents Antorio Hunter and Terrance Walker, along with their friends Nikki Long and Becky Lewis. Walker and Long were in the back bedroom when Petitioner and Little Bee knocked on the front door. Hunter answered the door and allowed both men to enter the apartment. Walker came out of the back bedroom, recognizing Petitioner, and said "I haven't seen you in a long time." Petitioner and Little Bee then purchased some marijuana.

Boone and Patterson then burst into the apartment armed with shotguns. The men searched the apartment for money and drugs. Petitioner, who had a handgun, hit Lewis on the head with his handgun, placed a pillow behind her head, and threatened to kill her. Petitioner led Lewis into the kitchen. Long was also in the kitchen. Little Bee and Patterson left the apartment, leaving Petitioner and Boone inside.

According to Boone, Hunter and Walker were lying on the living room floor. Petitioner ordered one of them to crawl next to the other so that his head would be next to the other's head. While on the floor, one of the men stated that he "didn't have no money or weed" and that he would not call the police. Nonetheless, according to Boone,

Petitioner said, "They know my name. I have to kill them." Petitioner then grabbed a pillow, hesitated, and shot one of the men in the back of the head. The other, still lying on the floor, said "Please don't kill me. I ain't going to say nothing." Petitioner placed a pillow behind the man's head and, after again hesitating, shot the man in the back of the head. Petitioner and Boone exited the apartment and joined Little Bee, Patterson, and Williamson in the car. Williamson drove the men back to her apartment, where they divided the robbery proceeds—about $40 in cash, $60 worth of marijuana, and a cellular phone.

In the interim, Lewis and Long, who heard the gunshots, waited until they felt it was safe to leave. They called Hunter's name, and when there was no response, they entered the living room. Upon seeing that Hunter and Walker had been shot and fearing the men might come back, Long and Lewis fled the apartment through a bedroom window. They called the police from another apartment.

At about 12:42 a.m., an officer responded to the dispatcher's call. Upon arriving at the apartment, the officer found the apartment door ajar and discovered the bodies of Walker and Hunter face down on the living room floor. A cushion with bullet holes was laying next to the victims.

Later that morning, Long met with an agent from the Bureau of Criminal Identification and Investigation and gave the agent enough information to create a composite sketch of Boone. Police distributed the composite sketch to the sheriff's department and the media. Boone subsequently turned himself in to the Franklin County Sheriff's Department. Boone cooperated with authorities and made a statement implicating Petitioner and the others involved in the shootings. Lewis subsequently identified Petitioner from a photo array lineup as the "guy with the little gun" who hit her over the head and threatened to kill her.

Police began collecting physical evidence related to the shootings. They retrieved a handgun from Williamson's apartment, which testing revealed was used to shoot Antorio Hunter. A firearms expert was unable to say conclusively that the same gun was used to shoot Terrance Walker, but the bullet did have some characteristics

matching Petitioner's handgun and matched the caliber of his weapon. Police also searched the apartment Petitioner shared with his girlfriend, Ivana King, and found a shotgun in a closet and two rifles concealed under the molding in the kitchen sink cupboard. The police also recovered nine .38 caliber bullets from the apartment. During a police interview, Ivana King stated that Petitioner told her he had "done two people."

Petitioner was arrested on March 28, 1997 and was subsequently indicted on six counts of aggravated murder for the deaths of Walker and Hunter. Each count of murder included two death penalty specifications for multiple murder and murder during an aggravated robbery in violation of Ohio Revised Code ("R.C.") § 2929.04(A)(5) and (A)(7). Petitioner was also charged with four counts of aggravated robbery, four counts of kidnapping, and one count of felonious assault. Each count carried a firearm specification.

Petitioner's trial commenced in Franklin County, Ohio. The trial court granted Petitioner's motion for acquittal on the count charging him with the aggravated robbery of Lewis, because Lewis testified that Petitioner did not demand or take money from her. The jury returned a guilty verdict on the remaining charges. At the conclusion of the penalty phase of the trial, the jury recommended that the court impose a death sentence. The trial court accepted the jury's recommendation and sentenced Petitioner to death. On direct appeal, the Ohio Supreme Court affirmed the trial court's decision.

On April 19, 1999, Petitioner filed a post-conviction petition in the trial court, raising 26 grounds for relief. On June 18, 2001, Petitioner's post-conviction petition was denied. In denying relief, the Ohio Court of Common Pleas concluded that many of the claims were barred as *res judicata* and that all of the claims lacked merit. Petitioner subsequently submitted an application to reopen his direct appeal, which was denied on January 16, 2002. Petitioner appealed the denial of post-conviction relief and the Ohio Court of Appeals affirmed. Petitioner sought review from the Ohio Supreme Court, which was denied on October 30, 2002.

In 2003, Petitioner filed an amended 28 U.S.C. § 2254 petition in federal district court, raising 18 grounds for relief.[1]   Respondent moved to dismiss several of Petitioner's claims as procedurally defaulted.  The district court granted in part and denied in part Respondent's motion on September 27, 2004.  After the parties litigated Petitioner's remaining claims, the district court concluded that those claims lacked merit and dismissed the petition on September 28, 2007.  The district court certified several of Petitioner's claims for appeal, and we granted Petitioner's motion to expand his certificate of appealability.   Shortly after we heard oral argument, we ordered supplemental briefing on whether the instruction given to the jury after the penalty phase of Petitioner's trial violated *Beck v. Alabama*.  Later still, we remanded the case to the district court for findings of fact and conclusions of law on that issue.  *See* 28 U.S.C. § 2106.  The district court concluded that the penalty-phase instruction was inconsistent with *Beck* and recommended that we grant Petitioner relief on that basis.  Respondent appealed that recommendation.

## DISCUSSION

### I.    Legal Framework

On appeal of a denial of a petition for a writ of habeas corpus, we review the district court's conclusions of law *de novo* and its factual findings for clear error. *Lovell v. Duffey*, 629 F.3d 587, 593–94 (6th Cir. 2011).   We accept the state court's

---

[1]Petitioner raised the following claims: (1) ineffective assistance of trial counsel; (2) extraneous influences affected the jury's determination at the sentencing phase; (3) the trial court failed to ensure that extraneous influences did not affect the jury at the sentencing phase; (4) the trial court denied Petitioner his right to present evidence of his relative culpability at the penalty phase; (5) the prosecution engaged in misconduct during its closing statement at the penalty phase; (6) the prosecution violated Petitioner's due process rights by deliberately causing co-defendant Michael Patterson not to testify as a defense witness; (7) the prosecution improperly bolstered its case by referencing matters outside the record; (8) the trial court issued an unconstitutional "acquittal first" instruction during the penalty phase; (9) the trial court violated due process by requiring the jury to unanimously vote to impose a life sentence; (10) a guilt-phase instruction unconstitutionally permitted the jury to presume the element of "purpose" from an absence of evidence of accident; (11) the trial court's jury instruction regarding "prior calculation and design" violated due process; (12) the prosecution violated Petitioner's constitutional rights by systematically excluding African-Americans from the jury; (13) Petitioner's due process rights were violated when the trial court allowed alternate jurors to retire to the jury room with the 12 regular jurors; (14) the trial court erroneously admitted into evidence firearms that were not identified as having been used in the conviction offenses; (15) ineffective assistance of appellate counsel; (16) Ohio's post-conviction process was unconstitutionally inadequate; (17) in Ohio, the death penalty is disproportionately imposed upon African-American defendants who kill white victims; and (18) cumulative error violated Petitioner's constitutional rights.

determination of a factual issue unless the petitioner upsets the presumption by clear and convincing evidence. *Moss v. Hofbauer*, 286 F.3d 851, 858–59 (6th Cir. 2002) (citing 28 U.S.C. § 2254(e)(1)).

Since Petitioner sought habeas relief in October 2003, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs his petition. Under AEDPA, an application for a writ of habeas corpus will not be granted with respect to claims adjudicated on the merits in state-court proceedings unless the adjudication:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "'contrary to' clearly established federal law if 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court on a set of materially indistinguishable facts.'" *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). A state-court decision is based on an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 763 (quoting *Williams*, 529 U.S. at 413). "Clearly established federal law" means "the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Id.* (quoting *Williams v. Bagley*, 380 F.3d 932, 942 (6th Cir. 2004), and *Williams*, 529 U.S. at 412.)

AEDPA's limitations permit this Court to award a petitioner relief only if the state court's application of federal law is "objectively unreasonable." *Goodell v. Williams*, 643 F.3d 490, 495 (6th Cir. 2011) (quoting *Williams*, 529 U.S. at 409). In order to award relief, we must determine that the state court's application of clearly

established federal law was unreasonable rather than simply incorrect. *Id.* To conclude that a state court's application of federal law was unreasonable, the Court must decide that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). Under this inquiry, we must first explain "what arguments or theories supported or . . . could have supported, the state court's decision." *Id.* Then, the Court must decide whether "fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* Only if there is no basis for disagreement among fairminded jurists can the Court award relief. *Id.*

In spite of these limitations, the Supreme Court has emphasized that AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* Rather, federal habeas review continues to serve the important role of "guard[ing] against extreme malfunctions in the state criminal justice systems." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

We examine the last state-court decision on the merits. *Garcia v. Andrews*, 488 F.3d 370, 374 (6th Cir. 2007). We review the state court's determination of mixed questions of law and fact under the "unreasonable application" element of AEDPA. *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

## II.     Ineffective Assistance of Counsel

### A.     Legal Framework

A defendant is not accorded his Sixth Amendment right to counsel if "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Representation is deficient under *Strickland* when counsel makes an error sufficiently grave that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Thus, to prevail on a claim of ineffective assistance of counsel, a petitioner "must demonstrate that counsel's

representation fell below an objective standard of reasonableness and that the [petitioner] was prejudiced by the ineffective assistance of counsel." *Carter v. Bell*, 218 F.3d 581, 591 (6th Cir. 2000). In assessing deficient performance, reviewing courts must take care not to "second-guess" strategic decisions that failed to bear fruit. *Strickland*, 466 U.S. at 689.

We cannot find counsel's performance deficient based on a strategic choice "made after thorough investigation of law and facts relevant to plausible options." *Id.* at 690. Strategic choices made after a "less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. Thus, counsel must make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary. *Id.* at 691. In a capital case, "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)).

To satisfy the prejudice element of *Strickland*, a petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The Supreme Court defines a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* When deciding whether counsel's errors prejudiced a defendant, we "must consider the totality of the evidence before the . . . jury," on the assumption that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 695. In a "weighing" state like Ohio, in which the jury must conclude that aggravating factors outweigh mitigating factors before recommending a death sentence, a petitioner demonstrates prejudice by showing that "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

**B.      Guilt Phase Claims**

**1.      Failure to Call Michael Patterson as a Trial Witness**

Petitioner first argues that trial counsel failed to zealously represent him because counsel did not call Michael Patterson as a witness.  Prior to trial, defense counsel discovered that Patterson sent Petitioner a letter indicating his willingness "to tell the truth" about the events at the apartment.  Defense counsel gave the prosecution a copy of the letter.  Petitioner's attorneys also set up a meeting with Patterson through Patterson's attorney.  During that meeting, Patterson reversed course and refused to speak with Petitioner's attorney.  He explained that he felt in danger of losing his plea agreement and promised that he would invoke his Fifth Amendment privilege if defense counsel called him to testify at Petitioner's trial.  Counsel ultimately declined to call Patterson to testify.  Petitioner faults trial counsel for this decision.  He argues that counsel should have at least called Patterson to the witness stand and allowed the trial judge to conduct *voir dire* regarding his claim of privilege.  Petitioner suggests that doing so would have revealed whether Patterson's testimony was helpful to him.

Petitioner's argument is unpersuasive, because counsel's decision not to call Patterson was a strategically defensible choice.  The underpinning of counsel's decision was the fact that trial counsel did not know what Patterson would say if he was called to the stand.  During his meeting with Petitioner's attorneys, Patterson refused to discuss the events at the apartment.  Given this fact, counsel could have called Patterson in hopes that he would testify favorably or invoke his Fifth Amendment privilege; but doing so would have risked allowing Patterson the forum to incriminate Petitioner if his testimony would have, in fact, been incriminating.  Even if Patterson gave favorable testimony, the prosecution had in its possession a statement from Patterson implicating Petitioner, which would have served as impeachment evidence.  Trial counsel cannot be faulted for finding the risk of Patterson's testimony to be too great.

Petitioner also contends that defense counsel had no duty to turn over Patterson's letter to the prosecution unless and until Patterson testified.  According to Petitioner,

there was no strategic purpose in informing the prosecutor about the letter, since turning the letter over significantly prejudiced Petitioner.  This argument erroneously assumes that the prosecution would not have had the opportunity to speak with Patterson before he testified or to impeach his testimony.  Before he wrote the letter, Patterson was slated to testify on behalf of the prosecution.  Petitioner's attorneys met with him at the prison facility where the state had moved him in preparation for trial.  Had Patterson decided to testify favorably to Petitioner, the prosecution would have learned about the decision soon enough.  Therefore, Petitioner's trial counsel did not forfeit any valid strategic advantage by turning over the letter.

Even if trial counsel's performance was somehow deficient with respect to Patterson's testimony, Petitioner has failed to show that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. On its face, Patterson's letter failed to show that Patterson's testimony would have helped Petitioner's defense.  Petitioner offered no other evidence of the content of Patterson's testimony suggesting that it would have been helpful and, if so, that he would have reneged on his plea agreement in order to offer the helpful testimony.  Hence, we have no basis for concluding that Patterson's testimony would have been favorable to Petitioner, much less affected the outcome of his trial.

### 2.     Failure to Request an Eyewitness Identification Expert

Petitioner argues that trial counsel erred by failing to elicit trial testimony from an eyewitness identification expert in order to rebut the testimony of Becky Lewis and Nikki Long.  Trial counsel renders ineffective assistance when he "fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict."  *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) (quoting *Reynosa v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006)).  The Supreme Court has acknowledged "the dangers inherent in eyewitness identification," *United States v. Ash*, 413 U.S. 300, 329 (1973) (quoting *United States v. Wade*, 388 U.S. 218, 235 (1967)), and we have noted that "eyewitness misidentification accounts for more

false convictions in the United States than any other factor." *Ferensic v. Birkett*, 501 F.3d 469, 478 (6th Cir. 2007). In *Ferensic,* we also explained that eyewitness identification expert testimony is "universally recognized as scientifically valid and of 'aid to the trier of fact' for admissibility purposes." *Id.* at 482 (quoting *United States v. Smithers*, 212 F.3d 306, 315 (6th Cir. 2000)).

Petitioner argues that defense counsel was ineffective for failing to seek testimony from an expert in eyewitness identification. Specifically, Petitioner asserts that because the identifications by Long and Lewis were essential to the prosecution's case, failure to investigate this issue was not reasonable trial strategy. In support, he offers an affidavit from Dr. Harvey Shulman, an eyewitness identification expert. Citing Dr. Shulman's opinion, Petitioner argues that Long and Lewis observed the events in the apartment while under the influence of alcohol and marijuana, making the conditions for their identification less than optimal. Petitioner further contends that these witnesses were influenced by certain outside factors prior to making their in-court identifications, allegedly casting doubt on them. Lewis was told that the suspect was in custody before she identified Petitioner in a photo array at the police station. Also, Long identified Petitioner in court only after seeing him on television. And Lewis's identification was purportedly "cross-racial" because she is white and Petitioner is black. Reasoning that the identifications by Lewis and Long were "essential" to the prosecution's case, Petitioner contends that counsel's decision not to seek expert testimony was strategically indefensible.

To the contrary, our consideration of the trial record convinces us that counsel's decision not to elicit expert testimony was not unreasonable. Petitioner's attorneys emphasized the potential weaknesses in the Lewis and Long identifications during the trial, even though they used other means than the one Petitioner argues they should have. Defense counsel tried to impeach Long and Lewis, raising the aforementioned impediments to their identifications on cross-examination. During closing argument, defense counsel stated that Lewis "testified that she was high and drank some beer, that she was scared that night, and two of her friends were killed." Defense counsel also

emphasized that Long never identified Petitioner until she saw him on television and that it was common sense that Lewis "was going to be able to sit in a courtroom and point out the only black man sitting . . . at counsel table as the defendant." Based upon defense counsel's statements and impeachment effort, we cannot conclude that defense counsel failed to pursue this issue.

Even if the Court were to find counsel's performance deficient in this respect, Petitioner has failed to show prejudice. In *Ferensic*, we upheld a district court's grant of habeas relief to a defendant convicted of armed robbery, where the trial court prevented the defendant's eyewitness identification expert from testifying. *Ferensic*, 501 F.3d at 471, 482–83. Our ruling was grounded on the trial court's refusal to allow the expert to testify, which we deemed a violation of the defendant's Sixth Amendment right to present a defense. *Id.* at 483. Crucial to our ruling in *Ferensic* was the fact that the only evidence against the defendant was his identification by the married couple victimized by the robbery. *Id.* at 482–83.

That was not the case here. The identifications of Lewis and Long were not the entire basis of the prosecution's case against Petitioner. Neither Long nor Lewis actually witnessed the shootings or identified Petitioner as the shooter. Instead, they identified him as one of the armed men who entered the apartment to rob them and as the individual armed with a handgun. The prosecution presented other evidence, some of it quite incriminating. Derrick Boone testified that he was in the room with Petitioner when Hunter and Walker were killed and that Petitioner was the shooter. Ivana King testified that Petitioner told her "he had done two people." As a result, Petitioner has failed to show that trial counsel's decision not to elicit testimony from an eyewitness identification expert was likely to alter the outcome of his case.

### 3.     Failure to Object to the Prosecution's Use of Leading Questions

Petitioner next contends that the prosecution excessively used leading questions during Boone's direct examination and that counsel's failure to object to those questions was objectively unreasonable. Because a state court may violate its own rules of

evidence without violating federal law, a state court's erroneous application of state law is only ground for habeas relief if the application also violates federal law. *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Such a violation occurs only if the "evidentiary ruling is so egregious that it results in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000). Therefore, we can only award relief where counsel's failure to object to the prosecutor's questions denied Petitioner a fair proceeding. *Cf. United States v. Nguyen*, 379 F. App'x 177, 181 (3d Cir. 2010); *Roe v. Belleque*, 232 F. App'x 653, 654–55 (9th Cir. 2007).

Petitioner contends that the prosecutor asked leading questions to Boone throughout the latter's testimony, to which defense counsel did not object. According to Petitioner, counsel's failure to object transformed the prosecutor into a witness for his own side because he was able to dictate the substance of Boone's answers. Petitioner argues that counsel's performance prejudiced him by allowing the prosecution to put an unsworn version of events on the record and prevented Petitioner from confronting Boone.

Petitioner's argument is unpersuasive, because he overstates the degree to which Boone's testimony was comprised of concessions to leading questions. The prosecutor asked Boone many open-ended questions. Boone's answers were terse, to be sure, and the prosecutor did ask many leading questions during his lengthy examination. But Petitioner's argument that Boone's testimony consisted of 69 transcript pages of "predominately monosyllabic" answers is factually incorrect. Our review of Boone's testimony discloses that much less of Boone's testimony resulted from leading questions from the prosecutor, and that Boone was more responsive than Petitioner contends he was.

Moreover, the form in which the prosecutor asked Boone questions was likely allowed under Ohio law. A leading question "instructs [the] witness how to answer or puts into his mouth words to be echoed back." *State v. D'Ambrosio*, 616 N.E.2d 909, 914 (Ohio 1993). Pursuant to Ohio Rule of Evidence 611(C), leading questions should

not be used during the direct examination of a witness except as necessary to develop the witness's testimony. But Rule 611(C) allows the use of leading questions "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." This exception "is quite broad and places the limits upon the use of leading question on direct examination within the sound discretion of the trial court." *State v. Lewis*, 448 N.E.2d 487, 490 (Ohio Ct. App. 1982). There is strong reason to believe that the trial court allowed the prosecution to ask Boone leading questions because Boone's testimony was at times reluctant and evasive. Boone testified that he had grown up with Petitioner and remained friends with him through the trial, that he did not want to testify, and that he had a difficult time incriminating his friend. In light of Boone's reluctance, the trial court was unlikely to sustain any objection to the form of the prosecutor's questions. Petitioner has failed to demonstrate that the trial court denied him a fundamentally fair proceeding by allowing the questioning. Therefore, we cannot fault counsel for declining to object to the questions.

### 4.     Failure to Present Impeachment Evidence Against Ivana King

Next, Petitioner contends that during the cross-examination of Ivana King, trial counsel should have raised the issue of bias she may have harbored against Petitioner.[2] King had been in a romantic relationship with Petitioner at the time of the murder, and she testified at trial that she remained in love with him. According to Petitioner, King was obsessively jealous of him because of his infidelity. Petitioner suggests that she may have testified falsely in order to assure his incarceration and thereby keep him away from other women. While Petitioner admits that trial counsel did question King about this possible source of bias, Petitioner argues that trial counsel should have pursued the issue more thoroughly and sought the testimony of other witnesses regarding the intensity of King's jealousy.

---

[2]There is some question regarding the appropriate standard of review for this sub-claim. In the district court, Petitioner argued that this sub-claim should be reviewed *de novo* because the state appellate court primarily rejected this claim on the basis of a procedural rule. *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003). Since we would reach the same result undertaking either *de novo* or AEDPA review, we need not decide the appropriate standard.

As Petitioner concedes, trial counsel did, in fact, attempt to impeach King on this very basis.  Counsel questioned her about a woman named Christy Johnson, who King admitted speaking with on the day of Petitioner's arrest.  According to King, Johnson called her that afternoon to talk about the fact that Johnson was "sleeping with Kareem Jackson."  King stated that she was angry with Petitioner at the time of the conversation.  Defense counsel also questioned King about Sheila Hamiter, the mother of Jackson's two children, in an attempt to reveal any jealousy King may have had about that relationship.

In light of counsel's efforts to raise the issue of King's possible bias, Petitioner's argument amounts to the contention that trial counsel should have pursued the issue more thoroughly.  On the facts of Petitioner's case, we cannot grant him relief on that basis.  Because counsel did raise the issue and pursued other lines of defense, we cannot find counsel's performance objectively unreasonable for declining to pursue the matter further, particularly when the effect of further probing is so speculative.  *See Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) ("Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel.").  Most cross-examinations can be improved but if that "were the standard of constitutional effectiveness, few would be the counsel whose performance [pass] muster." *Id.* (quoting *Willis v. United States*, 87 F.3d 1004, 1006 (8th Cir. 1996)); *see United States v. Munoz*, 605 F.3d 359, 381 (6th Cir. 2010).  Therefore, counsel did not perform ineffectively by not more forcefully pressing King on the issue of her possible bias.

### 5.      Jury Instruction on Unanimity

In his final ineffective assistance sub-claim regarding the guilt phase of his trial, Petitioner argues that trial counsel should have objected to what he describes as an "acquittal first" jury instruction.  In *State v. Thomas*, the Ohio Supreme Court held that a "jury is not required to determine unanimously that the defendant is not guilty of the crime charged before they may consider a lesser included offense upon which evidence has been presented." *State v. Thomas*, 533 N.E.2d 286, 293 (Ohio 1988) (internal

quotation omitted).  Rather, under *Thomas*, the jury must be allowed to return a verdict on the lesser included offense if it cannot agree, unanimously or not, to convict on the greater offense.  *Id.* at 292–93.

Relying on *Thomas*, Petitioner contends that counsel was ineffective for failing to object to the jury instruction.  This sub-claim is based on the following instruction:

> If you find that the State has proved all parts of the specification beyond a reasonable doubt, you must find the defendant guilty of that specification.

> If you find that the State has failed to prove beyond a reasonable doubt any part of specification number [X], you must find the defendant not guilty of that specification.

Petitioner argues that the "form and substance" of this instruction indicated to jurors that they were required to unanimously find Petitioner not guilty and were not allowed to acquit him based on a single juror's dissenting vote.

Since we cannot award Petitioner relief based on an error of state law alone, Petitioner must show that the instruction violated Ohio law in order to support the conclusion that counsel should have objected to it.  *Matthews v. Parker*, 651 F.3d 489, 522 (6th Cir. 2011).  He fails to make that showing.  The Ohio Supreme court rejected this claim, finding that "in this case the jury [was] not instructed to unanimously acquit the accused of an offense before moving to any lesser offense."  *Jackson*, 751 N.E.2d at 960; *see Seymour v. Walker*, 224 F.3d 542, 558 (6th Cir. 2000) (explaining that state supreme court's interpretation of its own law could not be questioned in assessing petitioner's claim that jury was improperly instructed).  The plain language of the jury instruction supports the Ohio Supreme Court's conclusion.  The emphasis of this instruction was the prosecution's burden; it directed the jury to convict Petitioner if the prosecution proved its case and to acquit him if the prosecution did not.  The trial court later explained that the jury was required to vote unanimously on any decision to convict, but the court did not assert, either implicitly or explicitly, that the jury was required to vote unanimously to acquit.  Because Petitioner fails to

demonstrate that the jury instruction violated Ohio law, we cannot conclude that counsel's decision not to object to the instruction was objectively unreasonable.

### C.       Penalty Phase Claims

### 1.       Failure to Question Juror Huddle

Petitioner argues that trial counsel should have questioned a juror regarding unusual events that occurred during the penalty phase of the trial.[3] The Sixth and Fourteenth Amendments guarantee a criminal defendant an impartial jury in state-court proceedings. *Madhi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). The state fails to vindicate that right for a defendant if "even a single biased juror" sits on the panel. *Williams*, 380 F.3d at 944 (citing *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)). If a trial court is faced with evidence of a juror's bias, the court "must conduct 'a hearing with all interested parties permitted to participate.'" *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005) (quoting *Remmer v. United States*, 347 U.S. 227, 230 (1954)).

A defendant must "do more than simply raise the possibility of bias" in order to obtain a full *Remmer* hearing. *Id.* To the contrary, a trial court needs to conduct a *Remmer* hearing only when the defense raises a "colorable claim of extraneous influence." *Id.* (internal quotation and citation omitted). An "extraneous influence" is "one derived from specific knowledge about or a relationship with either the parties or their witnesses." *Id.* (internal quotation and citation omitted). Examples of extraneous influences include "prior business dealings with the defendant, applying to work for the local district attorney, conducting an [out-of-court] experiment, and discussing the trial with an employee." *Id.* (internal citations omitted). A court must seek assurance from the juror that she is capable of proceeding without bias, and if a trial court "views juror assurances of continued impartiality to be credible, the court may rely upon such assurances." *United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984).

---

[3]There is again a question about the standard of review applicable to this case, but, once again, we need not decide the appropriate standard because we would reach the same result undertaking either *de novo* or AEDPA review.

After the jury found Petitioner guilty on the remaining counts but before the mitigation phase began, Juror Maureen Huddle returned home to find two men standing at the end of her street. She said they were in the middle of her street following her car. When Huddle pulled up to her house, upon seeing that her garage door was open, she opted not to pull into her driveway. Instead, she went to neighbor's house a few doors down and noticed that the two men were standing in her driveway. Huddle quickly notified the police, who came over and inspected her house. The police told Huddle that a van had been parked there about an hour earlier and they described the van. Two days later, the police knocked at Huddle's door at about 2:00 a.m. and informed her that her garage door was partially open.

Huddle informed the trial court of these incidents. The court held a brief colloquy with her and the parties and outside the presence of the other jurors. The trial judge asked Huddle whether she could fully focus on the case in spite of those incidents. She answered that she could. When the prosecutor asked if she brought the matter to the court's attention out of concern that it related to the case, Huddle responded: "I honestly think it is all coincidence, but I just thought I would mention it." Huddle also said that it was possible that her garage door was broken and stated that the incidents would not affect how she evaluated the evidence during the penalty phase of trial.

Defense counsel did not question Huddle, and Petitioner contends that counsel should have. Specifically, Petitioner argues that trial counsel should have questioned Huddle thoroughly and requested that the trial court admonish Huddle from discussing the incidents with her fellow jurors. The fact that the prosecutor asked Huddle whether she thought the incidents were connected to her service as a juror, asserts Petitioner, should have prompted defense counsel to question Huddle.

Trial counsel was not objectively unreasonable in declining to question Huddle. From the record of the trial judge's hearing, it appears that Huddle brought the incidents to the court's attention out of an abundance of caution. Both before and after the court asked her whether the incident was related to the trial, Huddle repeatedly stated that she did not believe it was. Huddle also stated that the incidents would not affect her ability

to perform as a juror.  It is not clear what other subjects counsel should have explored or why it was unprofessional for defense counsel to rely on the questions offered by the court and the prosecutor.

Seeking to establish prejudice resulting from counsel's failure to question Huddle, Petitioner offers an affidavit from another juror, James Cahill, III.  Cahill states that "[p]rior to the mitigation phase, [] Huddle informed the remaining jurors as to the bizarre phone calls that she received at her home and as to the incident that occurred near her home the night prior to the trial phase jury deliberations."  Cahill also asserts that Huddle "came in crying after these incidents and was taken home by someone one evening due to her fear."  According to Petitioner, Cahill's affidavit demonstrates that Huddle's reaction to the incidents was more severe than she disclosed to the court and that the issue merited more questioning from defense counsel.

Petitioner's argument is unpersuasive.  The implication of the argument is that Huddle's assertions to the trial court were suspect, but, as the Supreme Court has explained, a juror's assertion that she is fit to proceed is not "inherently suspect."  *Smith v. Phillips*, 455 U.S. 209, 217 n.7 (1982).  Indeed, beyond the emotional reaction described by Cahill, there is no indication that Huddle was unable to perform her duty.  Cahill's affidavit does not establish that Cahill or any of the other jurors thought that the incidents conveyed by Huddle were related to the trial.  Cahill's affidavit also fails to establish that the deliberations of Cahill, Huddle, or any of the other jurors were improperly influenced by the incidents or Huddle's reaction to them.  Moreover, the trial court's decision not to further question or admonish Huddle was based on the fact that Huddle minimized the import of the incidents and stated that she could devote her attention to the matters before the court.  There is also no evidence that the incidents could actually be deemed extraneous influences because there was no indication that Petitioner had any connection to them.

Even if Cahill's affidavit contained a stronger suggestion that Huddle was not able to perform her task, trial counsel would not have been privy to that information at the time of Huddle's colloquy with the trial judge.  In reviewing Petitioner's claim, we

are required to evaluate counsel's performance bearing in mind what counsel knew at the time of the trial. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Moreover, the lack of further information regarding Huddle's performance as a juror precludes Petitioner from demonstrating that the outcome of his case would have been different had counsel questioned her.

Petitioner also raises independent, substantive claims regarding the incidents involving Huddle unrelated to counsel's performance. Petitioner argues that the incidents affected the jury, contrary to Huddle's assurance, and that the trial court should have undertaken a more in-depth colloquy with Huddle to assure the incidents would not affect the jury. Because we have concluded that Petitioner has failed to show that the jury was, in fact, influenced in its deliberation by the Huddle incidents, we cannot award Petitioner relief on these claims.

### 2.    Investigation of Petitioner's Family and Social History and Preparation of Mitigation Witnesses

Petitioner next argues that trial counsel's investigation into his personal history was insufficient. Failure to reasonably investigate a defendant's background can constitute ineffective assistance of counsel. *Wiggins*, 539 U.S. at 522–23; *Williams*, 529 U.S. at 395–96. In considering this claim, we must take account of "the quantum of evidence already known to counsel," "whether the known evidence would lead a reasonable attorney to investigate further," and "whether counsel adequately followed up on the 'leads' that were available." *Wiggins*, 539 U.S. at 527; *Haliym*, 492 F.3d at 712. Counsel's investigation of mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1(C), p. 93 (1989)).

Where counsel abandons the investigation of mitigating factors at an unreasonable juncture, counsel is unable to make a fully informed decision regarding sentencing strategy; therefore, "conducting a partial, but ultimately incomplete, mitigation investigation does not satisfy *Strickland*['s] requirements." *Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006); *see Wiggins*, 539 U.S. at 527–28. However, "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Petitioner argues that trial counsel failed to investigate and prepare available mitigating evidence and thus failed to develop a complete personal history. He maintains that trial counsel failed to interview, or adequately interview, family and friends. Petitioner also argues that the interviews with his parents were inadequate because they did not focus on the family's generational history or on Petitioner's development. In support of this claim, Petitioner offers affidavits from several of those friends and family members demonstrating the trying circumstances he experienced as a young person. Those circumstances include: Petitioner's father drank alcohol excessively and physically abused Petitioner's mother; Petitioner's family moved homes on eighteen separate occasions before he reached age six; Petitioner attended five separate schools between kindergarten and eighth grade; Petitioner was left alone by his parents for extended periods of time and sought alternative "parental figures" in a local gang; and Petitioner's grandmother was the main source of stability in his life and, when she passed away, left Petitioner without a stable adult figure in his life.

This evidence overlaps considerably with the evidence admitted during the penalty phase of Petitioner's trial. Trial counsel pursued a mitigation strategy of admitting evidence of, on the one hand, Petitioner's troubled upbringing and, on the other hand, good qualities and deeds he performed while growing up. With respect to the former portion of the mitigation case, Petitioner's parents testified and described a youth in which Petitioner observed his parents' tumultuous partnership and largely lacked positive, loving adult role models. Petitioner's mother testified that his father was physically abusive with her. She explained that the family was financially destitute

and was therefore forced to frequently move homes while Petitioner was a child. Petitioner's mother also testified that her contact with Petitioner and his children had decreased considerably in the years prior to the murder. For his part, Petitioner's father testified that he moved away from Petitioner and his mother when Petitioner was still a child, and that he had no contact with Petitioner and provided him no financial support while Petitioner was a teenager.

Petitioner's mitigation case also included evidence of his good qualities. Petitioner's former pastor testified to Petitioner's involvement in the church through his adolescent years. Testimony also demonstrated that Petitioner had once saved a young boy from drowning in a pool, received the highest score in his GED course, and had never been fired from a job. The presentation of this evidence was the product of counsel's investigation, which included a psychologist's examination and interviews with Petitioner's family members and friends. *See Martin v. Mitchell*, 280 F.3d 594, 613 (6th Cir. 2002) (finding counsel's investigation sufficient when it included a background report, a psychiatric report, and the testimony of the petitioner's grandmother and mother).

To the extent there is any disparity between the evidence presented at trial and what Petitioner produces on post-conviction review, that evidence is largely cumulative. In order to show prejudice resulting from counsel's failure to investigate a capital defendant's personal history, a defendant's "new evidence . . . must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Fautenberry v. Mitchell*, 515 F.3d 614, 626 (6th Cir. 2008) (internal quotation marks and citation omitted). Counsel's failure to present cumulative evidence does not establish prejudice. *Id.* By way of example, as we explained, Petitioner's mother testified that her trying financial circumstances required her to move her family to many different homes during Petitioner's youth. On post-conviction review, Petitioner offered the more specific evidence that Petitioner moved over eighteen times before he was six-years-old. While the latter evidence sharpens the outlines of Petitioner's personal history from the picture offered at trial, the extra benefit to

Petitioner resulting from the increased specificity is marginal and, therefore, insufficient to support the conclusion that counsel erred by failing to proffer these more specific details.

The same can be said for two witnesses Petitioner argues that trial counsel should have called to testify, Sheila Hamiter (Petitioner's girlfriend) and William Woods (Petitioner's cousin). According to Petitioner, trial counsel conducted brief, introductory interviews with Hamiter and Woods. Petitioner argues that more thorough interviews with these witnesses, and trial testimony from them, would have "humanized" Petitioner in front of the jury. We assume that more testimony about Petitioner's good qualities would have given the jury a larger pool of information to draw upon in weighing the aggravating and mitigating factors. We cannot conclude, however, that a larger pool of information of the same type already offered was reasonably likely to have altered the jury's balancing decision. None of the evidence uncovered by Petitioner on post-conviction review reveals the sort of jarring facts about Petitioner's personal history that has led us to find glaring errors in attorney investigation in previous cases. *See, e.g., Williams v. Anderson*, 460 F.3d 789, 804–05 (6th Cir. 2006) (explaining that proper investigation would have shown, *inter alia*, that petitioner suffered from several personality disorders and suffered from drug-induced paranoia); *see also Hawkins v. Coyle*, 547 F.3d 540, 549–50 (6th Cir. 2008) (collecting cases).

Our conclusion regarding counsel's presentation of Petitioner's family and social history governs our consideration of Petitioner's claim that trial counsel failed to adequately prepare mitigation witnesses. Petitioner contends that trial counsel should have more thoroughly prepared the witnesses that testified on his behalf during his mitigation case. According to Petitioner, trial counsel spent too little time preparing those witnesses for the questions they would field, failed to review the answers that the witnesses should offer to particular questions, and devoted too much of their time with Petitioner's family members urging them to persuade Petitioner to accept a plea bargain. In particular, Petitioner points to the testimony of Ophelia Felder. Felder testified that Petitioner saved her grandson from drowning, but she could not answer many of

counsel's questions about the incident in detail.  Felder's grandson was in the courtroom while she testified.  According to Petitioner, had Felder's grandson testified, or had Felder been better prepared for the testimony, Petitioner's mitigation case would have more effectively humanized Petitioner to the jury.

Like Petitioner's argument regarding counsel's presentation of his family and social history, Petitioner offers no evidence to suggest that a different presentation of mitigation testimony would have provided the jury different information with which to make its sentencing decision.  Petitioner offers affidavits from his parents and other family members who did not testify during his mitigation case, but these affidavits include the same information that we have already concluded is repetitive or marginally more descriptive of the information disclosed to the jury.  Therefore, whatever duty counsel had to better prepare Petitioner's mitigation witnesses, counsel's compliance with that duty in a manner Petitioner would have preferred is unlikely to have led the jury to a different sentencing decision.

> ### 3.     Investigation of Petitioner's Psychological History and Vindication of Petitioner's Right to Have Jury Consider All Mitigation Evidence

Petitioner next contends that defense counsel was ineffective because they waited too long to hire a psychological expert, Dr. Kathleen Burch, and failed to provide her with background information to prepare for her interview with Petitioner.  As suggested by our earlier discussion, the failure to conduct "a reasonable investigation of a defendant's psychiatric history and family background, and to present mitigating evidence to the jury at sentencing, can constitute ineffective assistance."  *Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005) (citing *Wiggins*, 539 U.S. at 522–23).  Nevertheless, counsel can make a tactical decision not to present a psychologist's testimony at the penalty phase.  *See Hartman v. Bagley*, 492 F.3d 347, 360 (6th Cir. 2007) ("[C]ounsel might quite reasonably have made a strategic decision to present the report's mitigation findings through the more sympathetic lens of family members' testimony.").  The Supreme Court "has never stated as a per se rule that a particular type

of mental health expert is required in death penalty cases." *Carter v. Mitchell*, 443 F.3d 517, 526 (6th Cir. 2006).

Trial counsel were appointed in April 1997 and contacted Dr. Burch in October of that year. When Petitioner met with Dr. Burch in November 1997, he was purportedly evasive and reluctant to speak openly with her and thereby prevented Dr. Burch from administering a comprehensive set of psychological tests. On January 19, 1998, trial counsel and Dr. Burch participated in a phone call in which Dr. Burch told the attorneys about her conversation with Petitioner. Shortly thereafter, trial counsel notified Dr. Burch that they had decided against using her testimony in Petitioner's mitigation case. In an affidavit, Dr. Burch avers that she could have prepared mitigation testimony if she had more time to spend with Petitioner. Petitioner argues that the time constraint prevented Petitioner and Dr. Burch from building a rapport and building trust conducive to Petitioner speaking candidly with her. Consequently, Petitioner contends, the jury failed to hear about "instability and violence in [his] upbringing."

In assessing the reasonableness of counsel's decision not to seek Dr. Burch's testimony, we begin by noting that Petitioner impeded Dr. Burch's attempt to obtain a complete set of tests from him by declining to speak openly with her during the examination. The fact that Dr. Burch was unable to formulate a thorough opinion on Petitioner's psychological condition—itself a result in large part of Petitioner's conduct—makes it more difficult to fault counsel for deciding not to rely on testimony with less-than-obvious value to Petitioner's mitigation case. We always begin assessing counsel's assistance with the presumption that counsel's performance falls within the spectrum of reasonable professional judgment. *Strickland*, 466 U.S. at 689. Petitioner's decision not to assist Dr. Burch makes it more difficult to overcome that presumption.

The remaining evidence suggests that counsel's decision not to seek Dr. Burch's testimony was not unreasonable. The details of Dr. Burch's conversation with trial counsel on January 19, 1998 are not clear; Dr. Burch was unable to recall them in her affidavit. Thus, we are certain only that Dr. Burch gathered some unspecified information from her discussion with Petitioner, Dr. Burch likely relayed the information

to trial counsel during their phone conversation, and counsel told Dr. Burch shortly thereafter that they would not ask her to testify during Petitioner's mitigation case. While the substance of the information Dr. Burch provided trial counsel is unclear, the psychological expert that examined Petitioner in preparation for post-conviction proceedings, Dr. Hugh Turner, asserted in his affidavit that his findings regarding Petitioner's psychological makeup were consistent with those of Dr. Burch. After a complete examination, Dr. Turner concluded that the difficult circumstances of Petitioner's upbringing led Petitioner to blame others for his own problems and created the conditions for significant relational problems he had with peers and authority figures. Trial counsel offered other evidence supportive of these conclusions during Petitioner's mitigation case, in the form of testimony from his parents. If Dr. Burch conveyed information to trial counsel consistent with Dr. Turner's findings, then, counsel may have concluded that offering repetitive testimony would not have served Petitioner's purposes. Thus, the evidence before us would make it difficult to upset the presumption that counsel's decision not to seek Dr. Burch's testimony was defensible trial strategy.

Dr. Turner's findings strengthen the conclusion that counsel's decision was not unreasonable, while also supporting the conclusion that Petitioner was not prejudiced by counsel's decision. As we explained above, Dr. Turner concluded that Petitioner had significant relational problems, tended to blame others for his problems, and had poor decision-making skills and impulse control. According to Dr. Turner, these traits resulted from Petitioner's dysfunctional and unstable family environment characterized by, among other things, Petitioner's parents' failure to nurture him. Dr. Turner's findings and conclusions are consistent with the evidence trial counsel presented in Petitioner's mitigation case. As we have explained, we have found unreasonable performance by counsel prejudicial to petitioners where post-trial investigation reveals significant behavior-shaping psychological problems not discovered by trial counsel. *See, e.g., Williams*, 460 F.3d 789, 804–05. No such discovery occurred here. Therefore, Petitioner was not prejudiced by the manner in which trial counsel sought out and used Dr. Burch's expert opinion.

Petitioner also relies on Dr. Turner's findings and conclusions for his claim that trial counsel failed to vindicate Petitioner's right to jury consideration of all mitigating evidence. *See Penry v. Lynaugh*, 492 U.S. 302 (1989); *Hitchock v. Dugger*, 481 U.S. 393 (1987). According to Petitioner, the jury never learned the degree to which Petitioner's life was characterized by exposure to domestic violence, displacement, and neglect, as a result of counsel's decision not to seek testimony from a psychological expert. This argument is incorrect. As we have explained, trial counsel used other means for airing the painful details of Petitioner's childhood to the jury, and counsel's decision not to use the testimony of a psychological expert for that purpose did not prejudice him.

#### 4.     Testimony of Cultural Expert

Petitioner contends that counsel was ineffective because they failed to seek a cultural expert's testimony. Petitioner offers an affidavit from Dr. Kwaw David Whittaker, which discusses the concept of "cultural nullification" as a process by which pervasive social practices limit life potential, create lower life expectancies, and result in more challenging living conditions. Whittaker's affidavit applies this concept to African-Americans, particularly males. Examining Petitioner's social and family background, Dr. Whittaker opines that cultural nullification affected generations of Petitioner's family and resulted in Petitioner's self-destructive path. Petitioner contends that presenting the testimony of a cultural expert would have created a reasonable probability that at least one juror would have reached a different outcome during the penalty phase.

Dr. Whittaker's testimony would have contradicted trial counsel's mitigation strategy. Rather than painting Petitioner exclusively as the victim of a difficult childhood, defense counsel opted to humanize Petitioner by focusing on his positive characteristics as well as the portions of his childhood that made his early life so difficult. Because this strategy was not objectively unreasonable, it is entitled to "heavy deference." *Wiggins*, 539 U.S. at 521–22 (quoting *Strickland*, 466 U.S. at 690–91) ("[S]trategic choices made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). We have also suggested that this specific strategy is a legitimate one. *Johnson v. Bagley*, 544 F3d 592, 599 (6th Cir. 2008). It would have contradicted the evidence of Petitioner's good qualities, such as his act of saving Felder's grandson from drowning and his extensive involvement in church during his adolescent years, for counsel to present testimony that Petitioner had virtually no chance to lead a productive and responsible life. It would have also contradicted the testimony of Petitioner's mother, who emphasized the stable aspects of Petitioner's youth and the fact that Petitioner was relatively young when she was abused by Petitioner's father. Therefore, we cannot fault counsel for declining to present mitigation testimony that would have contradicted the valid mitigation strategy counsel was pursuing. *See Carter*, 443 F.3d at 528 (concluding counsel's decision not to seek testimony from a cultural expert was not unreasonable when the testimony would have contradicted that of other mitigation witnesses).

### 5.     Admission of Penalty Phase Evidence Unrelated to Aggravating Circumstances

Next, Petitioner asserts that pursuant to *State v. DePew*, 528 N.E.2d 542 (Ohio 1988) and R.C. § 2929.03(D)(1), defense counsel rendered ineffective assistance by failing to object when, during the penalty phase, the court admitted evidence previously admitted during the guilt phase. In *DePew*, the Ohio Supreme Court held that at the penalty phase of a capital trial, the prosecution can introduce "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing." *Id.* at 282–83.

Petitioner reads *DePew* to prohibit the admission of any evidence that does not directly relate to the aggravating circumstances found by the jury. This evidence at issue includes a large sketch of the crime scene, photographs of the crime scene, the seat cushion placed over the victims' heads, bloody carpet, plastic baggies, a shotgun, and a rifle. According to Petitioner, this evidence should not have been admitted during the

penalty phase, because the evidence was unrelated to any of the aggravating circumstances the jury was required to find and weigh with any mitigating circumstances. Therefore, Petitioner contends that counsel should have objected to the evidence's admission.

Petitioner's description of Ohio law is incorrect. In *DePew*, the Ohio Supreme Court noted that R.C. § 2929.093(D)(1) "permit[s] repetition of much or all" of the evidence in the penalty phase that the court admitted during the guilt phase. *Id.* at 282–83. In *State v. Ketterer*, 855 N.E.2d 48 (Ohio 2006), the Ohio Supreme Court further explained that the penalty phase in a capital trial in Ohio is "not limited to evidence that pertains only to the aggravating circumstances" and repeated *DePew*'s holding that "a trial court may properly allow repetition of much or all that occurred in the guilt phase" under § 2929.093(D)(1). *Id.* at 71 (internal quotation and citation omitted). A trial court is required to determine the admissibility of evidence, but the court has considerable discretion in making this determination. *See State v. Hancock*, 840 N.E.2d 1032, 1053 (Ohio 2006).

All told, Ohio law leaves no room for concluding that the trial court's admission of the evidence listed above was improper. Therefore, counsel's decision not to object to admission of the evidence was not objectively unreasonable.

### D.    Ineffective Assistance of Appellate Counsel

Petitioner reformulates several of the ineffective-assistance claims considered above into claims of ineffective assistance of appellate counsel. In perfunctory fashion, Petitioner argues that appellate counsel unreasonably failed to raise the following claims on direct appeal:

1.    Trial counsel failed to adequately investigate and prepare for the cross-examination of State witnesses Derrick Boone and Malaika Williamson.

2.    Trial counsel failed to request either funds for or the assistance of an eyewitness-identification expert.

3.      Trial counsel failed to present the jury with a "cohesive" defense theory.

4.      Trial counsel failed to object to improper jury instructions at the guilt phase.

5.      Trial counsel did not adequately prepare mitigation witnesses.

6.      Trial counsel's failure to object to prosecutorial misconduct during closing argument at the penalty phase prejudiced [Petitioner].

7.      The trial court should have instructed the jury that its vote did not have to be unanimous as to whether a mitigating factor existed.

Petitioner lists these claims, but does not elaborate on them. Because Petitioner does not develop these claims, he has waived them. *See Benge v. Johnson*, 474 F.3d 236, 245 (6th Cir. 2007) (citation omitted) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). The claims would fail even if they were not waived. Because the *Strickland* standard applies to claims of ineffective assistance of appellate counsel, we could not deem any of these claims meritorious after having denied each of the underlying ineffective assistance claims. *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003).

## III.    Penalty Phase Jury Instruction Regarding Jury's Sentencing Options

Petitioner argues that the trial court gave the jury an unconstitutional "acquittal first" instruction during the penalty phase of his trial, in violation of the Eighth Amendment. In the first of two interwoven arguments, Petitioner contends that the instruction given to the jury regarding their weighing of aggravating and mitigating factors improperly required the jury to unanimously agree not to recommend the death penalty before recommending a life sentence. In assessing whether a jury instruction violates the Eighth Amendment, we decide "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Davis v. Mitchell*, 318 F.3d 682, 687 (quoting *Jones v. United States*, 527 U.S. 373, 390

(1999)).  If it is reasonably likely that the jury applied the instruction in a prohibited manner, the death sentence cannot stand.  *Mills v. Maryland*, 486 U.S. 367, 377 (1988).

An acquittal first instruction is "any instruction requiring that a jury unanimously reject the death penalty before it can consider a life sentence."  *Davis*, 318 F.3d at 689. Such an instruction requires the jury to unanimously agree that the mitigating factors outweigh the aggravating factors in order to recommend a life sentence, as opposed to allowing a life sentence based on a single juror's view that the mitigating factors outweigh the aggravating factors.  *See Mapes v. Coyle*, 171 F.3d 408, 416 (6th Cir. 1999); *Davis*, 318 F.3d at 685.  That procedure in turn prohibits jurors from considering the mitigating factors not found unanimously in determining whether to recommend a death sentence, which the jury must be allowed to do.  *See Mills*, 486 U.S. at 374–75; *see also Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982).

Petitioner argues that an instruction the trial court gave in this case was similar to those we found impermissible in *Mapes* and *Davis*.  In *Mapes*, the trial court instructed the jury that in order to impose a death sentence, the jury must "find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors."  *Mapes*, 171 F.3d at 416.  The trial court went on to instruct the jury that in order to impose a sentence of life imprisonment, the jury "must unanimously find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances . . . outweigh the mitigating factors."  *Id.*  In our judgment, the trial court's instruction required all jurors to agree that the balance tipped in favor of the mitigating factors before deciding upon a life sentence.  *Id.* (citing *State v. Brooks*, 661 N.E.2d 1030, 1041 (Ohio 1996)).  That requirement contravened Ohio law, which led us to suggest that appellate counsel performed deficiently for failing to raise the error on appeal.  *See id.*

In *Davis*, the trial court instructed the jury that it had to unanimously find that the aggravating circumstances outweighed the mitigating factors in order to impose the death sentence.  *Davis*, 318 F.3d at 689.  The trial court then instructed the jury that in order to impose a life sentence, the jury "must find that the State . . . failed to prove

beyond a reasonable doubt that the aggravating circumstances . . . outweigh the mitigating factors." *Id.* The trial court went on to tell the jury that because "this is a criminal case the law requires that in order for [the jury] to reach a decision all 12 [jurors] must be in agreement." *Id.* The verdict form also required the jury to unanimously find that the aggravating factors did not outweigh the mitigating factors. *Id.* at 690–91. Taken together, the court's instruction and verdict form required the jurors to unanimously reject the imposition of the death penalty before recommending a life sentence, a requirement that violates federal law. *Id.* at 688–90; *see Mills*, 486 U.S. at 374–75.

In this case, the trial court read the following instruction at the end of the penalty phase of Petitioner's trial:

> The prosecution has the burden to prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty outweigh the factors in mitigation before the death sentence may be signed. To outweigh means to weigh more than, to be more important than. The existence of mitigating factors does not preclude or prevent the death sentence, if you find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. However, if you are not unanimously convinced by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, then you must choose one of the life sentences.
>
> If you find the aggravating circumstances and the mitigating factors to be of equal weight, then you must choose one of the life sentences.
>
> You shall sentence the defendant to death only if you unanimously find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.
>
> If you do not so find, you shall consider either a sentence of life without parole eligibility, a life sentence with parole eligibility after serving 30 full years of imprisonment, or a sentence of life without parole eligibility after serving 25 full years of imprisonment. Verdict forms with these four options as to each count will be furnished to you.

The verdict forms read as follows:

> We, the jury in this case, being duly impaneled and sworn, having found the defendant guilty, do unanimously find beyond a reasonable doubt that

the aggravated circumstances of which the defendant was found guilty outweigh the mitigating factors, and we recommend that the sentence of death be imposed.

\*     \*     \*     \*     \*

We, the jury in this case, being duly impaneled and sworn, having found the defendant guilty do not unanimously find beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty outweigh the mitigating factors, and we further unanimously find that the sentence to be imposed is a term of life imprisonment without parole eligibility.

The instruction and verdict forms do not contain the errors we found present in the instructions and forms at issue in *Mapes* and *Davis*. Jurors were instructed that they could only return a death sentence if they all concluded beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors. Then, the trial court explained that the jury was required to consider one of three other sentences "if [the jury was] not unanimously convinced by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors." By making jury unanimity one of the conditions required for the jury to return a death sentence, the instruction reasonably implied that anything less than jury unanimity as to the balance of aggravating and mitigating factors would require a sentence less severe than death. The second verdict form is consistent with this interpretation. Had the jury filled out that form, it would have ordered a life sentence because it "d[id] not unanimously" conclude beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. Like the trial court's instruction, the second verdict form reasonably implied that anything less than jury unanimity regarding the balance of aggravating and mitigating factors would require a life sentence. Therefore, contrary to Petitioner's argument, it is unlikely that the jury interpreted the instruction and verdict forms used in this case to require unanimous rejection of a death penalty recommendation.[4]

---

[4]On appeal of the district court's opinion recommending granting the writ, Petitioner argues that the instruction, considered in the context of the entire jury charge, conveyed that the jurors needed to unanimously agree in rejecting a death sentence in favor of a life sentence. The Supreme Court has explained that a court hearing an Eighth Amendment challenge to jury instruction must consider the particular challenged instruction "in the context of the overall charge." *Boyde v. California*, 494 U.S. 370 (1990) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)). According to Petitioner, viewed as a

In his second argument, Petitioner contends that the jury instruction and forms violated *Beck v. Alabama*. In light of the Supreme Court's decision in *Bobby v. Mitts* ("*Mitts II*"), 131 S. Ct. 1762 (2011) (per curiam), we conclude that the instruction and forms do not violate *Beck*.

In *Beck*, the Supreme Court held that a jury instruction violated the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment when it prohibited a capital jury from returning a guilty verdict on a lesser included offense to capital murder. *See Beck*, 447 U.S. at 632, 643. According to the Court, the availability of a guilty verdict on a lesser included offense aids a defendant because, "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction." *Id.* at 634. Thus, a jury could typically return a verdict on a lesser included offense if it was uncertain that a defendant merited capital punishment, thereby ensuring the defendant's punishment while vindicating the jury's concern about the defendant's worthiness for a death sentence. *See id.*

During the guilt phase of the *Beck* defendant's trial, the judge did not instruct the jury that it could return a guilty verdict on the lesser included offense of felony murder. *Id.* at 630. According to the Supreme Court, the absence of such an instruction prohibited the jury from resolving any residual doubt about the defendant's guilt with a life sentence. Under the instruction given by the trial court, the jury was essentially "given the choice of either convicting the defendant of the capital crime, in which case it [was] required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime." *Id.* at 628–29.

The Court concluded that this choice distorted the jury's guilt deliberation. *Id.* at 637. Because the jury was required to consider the two sentencing options while

---

whole, a reasonable juror would have understood the instruction in his case to require jury unanimity in rejecting a death sentence. This argument is unpersuasive. We have already concluded that the instruction read to the jurors in this case did not require the jurors to unanimously reject a death sentence, and viewing the instruction in the context of the entire jury charge does not increase the likelihood that a juror would have understood the instruction to include that requirement.

simultaneously considering the defendant's guilt, the court's instruction "interject[ed] irrelevant considerations into the factfinding process" by "diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime." *Id.* at 642. Regardless of whether the jury was likely to resolve any residual doubts about the defendant's guilt in favor of acquittal or conviction, the diversion of the jury's attention away from the guilt determination "introduce[d] a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." *Id.* at 643. This "uncertainty and unreliability" ran afoul of the constitutional prohibition on "the 'wanton' and 'freakish' imposition of the [death] penalty." *Id.* at 639 (quoting *Furman v. Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring in the judgment)).

Shortly before we heard oral argument in Petitioner's case, the Supreme Court decided *Smith v. Spisak*, 130 S. Ct. 676, 684 (2010). In *Spisak*, the Supreme Court held that an Ohio jury instruction and accompanying verdict forms did not lead members of the jury to believe that they were required to unanimously find the existence of individual mitigating factors and, therefore, that the instruction and forms did not violate *Mills v. Maryland*. Justice Stevens concurred in the Court's judgment but, urging the importation of *Beck* into the penalty phase context, argued that the jury instruction and forms violated *Beck*. Essentially positing an analogy between the *Beck* instruction and the penalty-phase instruction in *Spisak*, Justice Stevens argued that the *Spisak* instruction "deprived the jury of a meaningful opportunity to consider the third option" of a life sentence. *Spisak*, 130 S. Ct. at 691 (Stevens, J., concurring in the judgment). According to Justice Stevens, the instruction at issue in *Spisak* likely led the jury to believe that if it did not sentence the defendant to death, the defendant would receive a new trial. *See id.* The instruction's failure to more clearly notify the jury of the possibility of a life sentence made them inconsistent with *Beck*, in Justice Stevens' opinion. *See id.*

We heard oral argument in Petitioner's case shortly after the Supreme Court issued *Spisak*. Shortly thereafter, we ordered supplemental briefing regarding the jury-instruction issue in light of Justice Stevens' concurring opinion in *Spisak*. Later

still, we remanded the case to the district court for findings of fact and conclusions of law on the issue.  *See* 28 U.S.C. § 2106.

The district court recommended granting the writ on the basis of *Beck*, Justice Stevens' *Spisak* concurrence, and our opinion in *Mitts v. Bagley*, 620 F.3d 650 (6th Cir. 2010) ("*Mitts I*"), later vacated by the Supreme Court in *Mitts II*.  In *Mitts I*, this Court adopted Justice Stevens' reasoning and concluded that a penalty phase jury instruction violated *Beck*.  *See Mitts I*, 620 F.3d at 657–58.  We read Justice Stevens' concurring opinion to find an instruction to violate *Beck* when it "only allows for consideration of a sentence of life after consideration of the mandatory death penalty is completed by a verdict of acquittal." *Id.* at 656–57.  Accordingly, we read *Beck* to require an instruction to "make clear that the jury does not have to complete its death deliberation before considering a life sentence." *Id.* at 658.

The district court followed suit, concluding that the instruction given to Petitioner's jury "deprived the jury of a meaningful opportunity to consider the third option" of a life sentence.  *Spisak*, 130 S. Ct. at 691 (Stevens, J., concurring in the judgment).  The court focused on the instruction's reference to juror unanimity, arguing that the only logical interpretation of the instruction would require the jurors to unanimously decide against imposing the death penalty before considering whether to impose a life sentence.  Thus, the district court concluded that the instruction violated *Beck*, as interpreted by Justice Stevens in *Spisak* and this Court in *Mitts II*, because it distorted the jury's penalty deliberation.  The court recommended that we grant Petitioner habeas relief.

While Petitioner and the Warden briefed the district court's recommendation, the Supreme Court decided *Mitts II*.  In *Mitts II*, the Supreme Court rejected the contention offered by Justice Stevens and this Court that *Beck* applied to the sentencing phase of a capital trial. *See Mitts II*, 131 S. Ct. at 1764.  According to the Supreme Court, the fact that a penalty phase jury instruction was at issue in *Mitts II* made *Beck* inapplicable: because the jury had already found the petitioner guilty of aggravated murder, the Court found it unlikely that jurors would be "improperly influenced by a fear that a decision

short of death would have resulted in [the petitioner] walking free." *Id.* at 1765. The Court rejected Justice Stevens' analogy between guilt phase and penalty phase instructions:

> The jurors in [the petitioner's] case could not have plausibly thought that if they declined to recommend the death penalty [the petitioner] would "escape all penalties for his alleged participation in the crime." *Beck*, [447 U.S.] at 629 []. They had just convicted him on two counts of aggravated murder and two counts of attempted murder. They were specifically instructed that if they did not find that the aggravating factors outweighed the mitigating factors—and therefore did not recommend the death penalty—they would choose from two life sentence options. There is accordingly no reason to believe that the jurors in this case, unlike the jurors in *Beck*, could have been improperly influenced by a fear that a decision short of death would have resulted in [the petitioner] walking free.

*Id.* On the basis of this reasoning, the Court concluded that a penalty phase instruction that requires a jury to unanimously reject the death penalty before considering a life sentence does not violate clearly established federal law, as it must in order to merit habeas relief. *See id.*

The jury instruction and verdict forms in Petitioner's case are not palpably different than the instructions and forms at issue in *Spisak* and *Mitts II*. The instruction and forms are little different in form and virtually identical in substance to those the Supreme Court held constitutional. And regardless of the likeness that the instruction and forms bear to one another, *Mitts II* made it clear that an argument about a *Beck* violation is unavailable to a petitioner challenging his penalty-phase jury instruction. Hence, after *Mitts II*, neither the district court's nor Petitioner's arguments carry force, because they support a ground for habeas relief that *Mitts II* held is not available to Petitioner.

On appeal of the district court's recommendation, Petitioner attempts to resuscitate his claim by arguing that his jury instruction runs afoul of the Ohio Supreme Court's ruling in *State v. Brooks*. In *Brooks*, the Ohio Supreme Court held that "a solitary juror may prevent a death penalty recommendation by finding that the

aggravating circumstances in the case do not outweigh the mitigating factors" and ordered that "[j]urors from this point forward should be so instructed." *Brooks*, 661 N.E.2d at 1042. As Petitioner points out, the instruction at issue in this case—which was given two years after *Brooks* was decided—did not in so many words tell jurors that a solitary one of them could prevent a death-sentence recommendation. Petitioner argues that the trial court committed constitutional error by failing to follow *Brooks*, but a simple error of state law is not cognizable on federal habeas review, absent a showing that the error compromised the Petitioner's due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984).

In sum, the penalty phase jury instruction in Petitioner's case did not violate the Eighth Amendment, either by requiring the jury to unanimously agree on the applicability of any mitigating factors or by depriving the jury of the opportunity to recommend life in prison as an alternative sentencing option to a death sentence.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's original decision in case number 07-4326 **DENYING** the petition for writ of habeas corpus and **REVERSE** the district court's order in case number 10-4592.