RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0361p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

LEON ROBINS,

     *Petitioner-Appellant,*

        *v.*

JAMES FORTNER, Warden,

     *Respondent-Appellee.*

No. 10-6125

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:07-cv-429—William J. Haynes, Jr., District Judge.

Decided and Filed: October 17, 2012

Before: ROGERS and KETHLEDGE, Circuit Judges; MARBLEY, District Judge.[*]

_____

**COUNSEL**

_____

**ON BRIEF:** James A. Simmons, Hendersonville, Tennessee, for Appellant. Brent C. Cherry, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

_____

**OPINION**

_____

     ALGENON L. MARBLEY, District Judge. Petitioner Leon Robins was convicted of first-degree, premeditated murder in state trial court. After the state appellate court affirmed, Robins filed a habeas corpus petition in which he contends his trial counsel was ineffective for various reasons. The state trial court found that counsel's representation was not deficient or prejudicial, and the state appellate court affirmed. Robins filed a *pro se* habeas corpus petition in the district court, which was

_____

     [*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1

amended and then dismissed by the district court. Because Robins fails to demonstrate that the state appellate court's decision was unreasonable or improper under Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") deference, we AFFIRM.

I.

A.

The following facts are taken from the state appellate court's decision affirming the state trial court's conviction of Robins and his co-defendant, Tabatha White, for first-degree, premeditated murder:

> Around 10:00 p.m. on February 29, 2000, Lyntasha Simmons was inside her apartment at Nashville's Parkway Terrace Apartments when she heard gunshots outside. She looked out her door and saw a person lying on the ground. She had just telephoned the police when an onlooker informed her that it was her brother, Eugene Simmons, also known as Michael Roach, who had been shot. Simmons dropped the phone, ran to her brother's side, and waited for the police to arrive. The victim was transported by ambulance to Vanderbilt Hospital where he died the next day. Metro Nashville Police Officer Terrence Graves testified that, at 10:08 p.m., he received a dispatch regarding a shooting at that location. He arrived within a minute, saw that the victim had suffered gunshot wounds, and secured the scene.

> Amelia Patterson testified that she, along with Pamela Johnson, Tara Johnson, and their cousin, Gerald Johnson, was standing on the porch outside of Pamela's apartment on the night of the shooting. Pamela was on her cell phone talking to a person she referred to as "Tab" when she, referring to the victim, said, "[H]ere he go right here." Pamela told Gerald to bring the victim to her porch. Gerald approached the victim, who was walking just a few feet away, and "kind of like shook him up and brought him over to the porch." The victim "was refusing, but he finally came over there," and Pamela put him on the phone to speak with Tab, who wanted to "talk to him about her money." Patterson testified, "All I heard him say was that he was going to give her money at 11:30." Patterson said the conversation ended, and "I guess they had told her that they was on their way. They was on the Interstate and she had hung up." Pamela informed her that their discussion concerned "ten-dollars ($10.00) worth of white," meaning cocaine.

The victim proceeded to walk away when Pamela again instructed Gerald to bring him back to the porch. The victim protested, explaining that he had to go heat up the bag of food that he was carrying. Pamela responded that he could heat it up at her house and, apparently accepting this offer, he began walking toward her porch. Patterson testified that the victim "didn't make it on the porch," however. At this moment, Tab, accompanied by a man, emerged from the parking area and asked, "where her mother-fucking money was." The victim was never given the opportunity to respond to Tab's demand as the man, who was approximately five or six feet away from the victim, pulled a gun from his pocket and shot him. From the witness stand, Patterson identified Tab as the defendant Tabatha White and the gunman as the defendant Leon Robins. Patterson testified that the police attempted to question Pamela Johnson the night of the shooting, but she "wasn't really cooperating" and was "acting like she was hallucinating."

Tara Johnson testified that, in the days preceding the murder, Tabatha White asked her to keep on the lookout for the victim because she had given him "ten-dollars ($10.00) to do something for her." She remembered Pamela Johnson talking to White on her cell phone on the night of the shooting and informing her that the victim was present. She testified that Pamela told Gerald Johnson to bring the victim to her, which he did. The victim spoke with White on the telephone and told her that he would pay her at 11:30. As the victim attempted to leave, Gerald forced him to stay, and Pamela told him to heat his food at her house. Before the victim could enter the house, Tabatha White and a man approached. White said "she wanted her mother-fucking money," and the "dude" shot the victim. Tara heard three gunshots fired and ran into the house. She testified that she did not see either person's face, but recognized the voice as that of Tabatha White, even though she "didn't really know [her] that much."

Pamela Johnson testified that the defendants were at her house "[e]ither one or two days before" the shooting, and Tabatha White gave the victim ten dollars to procure drugs. Although she had known White "[f]or about two or three years," it was her first encounter with Leon Robins. When the victim failed to return with either the drugs or the money, White was "mad" and instructed Johnson to be on the lookout for him. On the night of February 29, Johnson, standing in her doorway, spotted the victim and called White on a cell phone. Johnson then called the victim over and put him on the phone with White. The phone cut off and the victim proceeded to leave. She called White back and had her cousin, Gerald Johnson, bring the victim back to the front of her house. Moments later, Robins shot the victim and White said "something to him about her money." Johnson testified that she thought the defendants were "just going to beat him up or something."

Detective Danny Satterfield of the Metro Police Department testified that, before trial, Pamela Johnson had told him that she was inside her house when the shooting occurred and could not identify the shooter. At Tabatha White's bond hearing, Johnson again stated that she did not witness the shooting and denied making phone calls to White prior to the shooting.

Saying that she had been scared, Pamela Johnson admitted to lying to the police on the night of the shooting by telling them both that she did not know who shot the victim and that Tabatha White had not been there, as well as lying at White's bond hearing. According to Johnson, White had called her and said "just keep the cool and . . . everything will be all right." At some point, however, Johnson changed her story and identified both defendants from photographic lineups, explaining that she "just had to tell the truth" and her "kids don't need to be having a momma that is getting in trouble for something she didn't do." On cross-examination, it was elicited from Johnson that the police "coerced" her regarding her testimony. However, neither the details of the alleged coercion, nor its alleged effect, was revealed.

Detective Satterfield testified that, during his investigation, he spoke with Amelia Patterson who told him that "she was there and witnessed the shooting incident." On March 9, 2000, he showed her a photographic lineup of suspects from which she identified Robins without any uncertainty as the man who shot the victim. From another photographic lineup, she identified Tabatha White as the woman who was with Robins. . . .

. . . .

Victoria Shelton, who lived in the apartment complex where the shooting occurred, testified that, on that night, she was inside her house and overheard Gerald Johnson tell the victim "that he was going to give him something." When the victim explained that he would pay him later that night, Gerald Johnson "kept saying no." "A few seconds, a couple of minutes" later, she heard four gunshots, went outside, and saw the victim on the ground. She saw a white Chevrolet Cavalier leave the parking lot, and she said that a "light-skinned male black" usually drove that particular car.

Harold Overton testified that he lived in Apartment U-166 at the Knollcrest Apartments. On March 3, 2000, Detective Clifford Mann, responding to an anonymous CrimeStoppers tip, visited Overton to question him about Tabatha White, who lived in nearby apartment U-162. He told Detective Mann that he was familiar with White and her occasional visitor, Leon Robins, whom he identified from a photographic

lineup.  A few nights earlier, according to his testimony, he witnessed Robins engaging in the following conversation:

> There was [sic] about three or four guys that were talking, and then one guy walked up and he said Leon, man, . . . they are looking for you. . . . And then he said, like, well, I don't give a fuck, you know, there is more than one Leon . . . and then he said besides that, they don't know my last name[.]

On cross-examination, Overton testified that he was fifteen to twenty feet away from the conversation and that, although it was dark, the area was well lit by a streetlight.

. . . .

> Marion Tucker testified on behalf of Leon Robins that, on the night of February 29, he, apparently, was a witness to the confrontation with the victim, saying, "I seen this female come up [and] assault [the victim] over ten-dollars ($10.00), and I turned around and ran, and that is all I seen." He stated that the woman who said "Where my ten dollars at?" was holding a gun.

> Robins' sister, Nicole House, testified that she was with him at their mother's house on the night of the shooting and, when she left "[b]etween 10:15 and 10:30," he was still there. On cross-examination, she testified that, although she had learned at the preliminary hearing the time and date of the murder for which her brother had been charged, she did not inform the police that she had been with him at the time of the killing. Martinique Robins, another sister of the defendant, also testified that, on the night of the murder, he still was at their mother's house when she departed, sometime "close to 10:30." Like her sister, she did not contact the police about her brother's whereabouts on the night and time of the shooting. Robins' mother, JoAnn Hardy, testified that her son was at home when she returned from work shortly after 11:00 p.m. on the night of the shooting.

*Tennessee v. Robins*, No. M2001-01862-CCA-R3-CD, 2003 WL 1386835, at *1–4 (Tenn. Crim. App. Mar. 20, 2003) (footnotes omitted).

B.

Robins then filed a habeas corpus petition for post-conviction relief, which was dismissed by the state trial court, and the dismissal was affirmed by the state appellate court. *See Robins v. Tennessee*, No. M2005-01204-CCA-R3-PC, 2006 WL 1816361,

at *1 (Tenn. Crim. App. June 27, 2006).  The following facts are recited in the state appellate court's decision:

> At the post-conviction hearing, the petitioner's trial attorney testified that he was appointed to represent the petitioner.  The attorney said he hired a private investigator to help him prepare the petitioner's defense.  He said the investigation revealed that the police initially considered someone named "Twenty" as a suspect in the murder.  He said his defense strategy at the trial was that the petitioner had an alibi.  He said he also introduced testimony at the trial from a witness who said the petitioner's co-defendant shot the victim.  The attorney said he met with the petitioner to discuss the case ten times before the trial.  The attorney acknowledged that the petitioner's co-defendant, Pamela Johnson, testified against the petitioner.  He said he could not remember, though, whether he filed a motion demanding to know if the state had an agreement with Ms. Johnson in exchange for her testimony.

> The attorney testified that he filed a motion to suppress the petitioner's identification based upon improper procedures used during the photograph line-up.  He said he recalled arguing about the issue of hair length as it related to the line-up.

> . . . .

> The attorney testified that the petitioner's name was originally brought to the attention of the police based upon an anonymous 9-1-1 call.  He said, however, that he failed to attempt to discover the identity of the caller.

> The attorney testified that he filed an amended notice of alibi which included the names of four witnesses.  He acknowledged that one of the witnesses was Ms. Christine McHenry.  He admitted that he had subpoenaed Ms. McHenry to testify at the trial but said that she was ill on the day of the trial and was not available.  He said he intended to call Ms. McHenry because she was the petitioner's grandmother, "and I think she was living in the house and would have supported the alibi defense."

> The attorney acknowledged that during the trial, he did not ask any of the witnesses about "Twenty's" reputation for violence.  He said he also did not ask whether "Twenty" "met the description of the shooter."

> The attorney testified that he did not object at the trial on the grounds of inadmissible hearsay to the testimony of Harold Overton.  The attorney admitted failing to object during closing arguments to the state's mischaracterization of Mr. Overton's testimony.

The attorney testified that the petitioner filed a complaint against him with the Board of Professional Responsibility. He said, however, that he did not bring this filing to the court's attention.

The attorney testified that his investigation revealed that Detective Mann threatened to take away the children of the petitioner's co-defendant, Pamela Johnson, if she did not cooperate with the police and testify against the petitioner. He acknowledged, however, that he did not cross-examine Pamela Johnson regarding Det. Mann's threat.

The attorney testified that after the state introduced photographs into evidence showing the petitioner with long hair consistent with witness testimony about the shooter, he discussed with the petitioner the propriety of introducing into evidence some of the petitioner's prior mug shots showing the petitioner with short hair. The attorney said he advised the petitioner that introducing the photographs into evidence was not a good idea because it would indicate to the jury that the petitioner had a lengthy criminal record. He said, however, that the petitioner insisted on introducing the photographs depicting his short hair. The attorney admitted not asking the court for a limiting instruction on the introduction of the mug shots.

The petitioner's attorney testified that he discussed the petitioner's right to testify with him. He said he did not actually prepare the petitioner to testify because alibi was the main defense. Concerning the petitioner's alibi defense, the attorney testified that he did not object to the trial court's alibi jury instruction. The petitioner's attorney also testified that he did not request the trial court to give the jury a specific instruction of how it should weigh direct versus circumstantial evidence.

. . . .

On cross-examination, the petitioner's attorney admitted that no discovery documents existed stating that "Twenty" committed the murder. Rather, he said the documents reflected that "Twenty" was someone who could have been involved. The petitioner's attorney acknowledged that he concentrated his investigative resources on finding people to establish the petitioner's alibi.

. . . .

Roger Clemons testified that he was the private investigator hired by the petitioner's attorney. Mr. Clemons said that after his investigation was complete, he provided the petitioner's attorney with the information that he collected. He said that he located a person with the street name of "Twenty" and that the person's actual name was Kenneth Frazier Taylor. Mr. Clemons said he interviewed Mr. Taylor who admitted he was also known as "Twenty." He said "Twenty" initially denied

knowing the petitioner but later admitted that he had fathered a child with the petitioner's sister, Nicole House. Mr. Clemons said "Twenty" also admitted driving a white car during the time of the shooting. Mr. Clemons said he also interviewed Ms. House who said that "Twenty" was known in the community as an armed drug dealer who hung around the area of the shooting.

Mr. Clemons testified that the only alibi witness who was with the petitioner at his home the entire night was Ms. McHenry, a witness not called by the petitioner's attorney. Mr. Clemons said Ms. McHenry was not related to the petitioner but was only residing in the home during the time of the shooting. Mr. Clemons acknowledged serving a subpoena on Ms. McHenry for her to testify at the trial.

Mr. Clemons testified that as a part of his investigation, he learned that Detective Satterfield was coaching one of the trial witnesses, Amelia Patterson. Mr. Clemons said he interviewed the witnesses who overheard the coaching incident and provided the information to the petitioner's attorney.

Mr. Clemons testified that the length of the petitioner's hair was an issue in the case. He said the petitioner's mother told him that she had allowed the petitioner to move home before the shooting but only if he cut his hair and that the petitioner cut his hair and returned home. Mr. Clemons said this contrasted with the descriptions of the shooter's hair as long hair with a ponytail.

Mr. Clemons testified that he interviewed Amelia Patterson who told him the perpetrator had dark skin. Mr. Clemons said, however, that the petitioner was light-skinned because his mother was Caucasian. Mr. Clemons also said he was unable to link the petitioner with any cars white in color and matching the description given by the eyewitnesses. He said he provided this information to the petitioner's attorney

. . . .

Metropolitan Police Department Detective Danny Satterfield testified that he investigated the petitioner's case. Det. Satterfield said he did not recall the shooter's length of hair being an issue in the case. He admitted that the witnesses described the shooter as driving a white car. Det. Satterfield said he did not recall having a conversation with Amelia Patterson before her testimony at the preliminary hearing. He said he also did not recall coaching Ms. Patterson as to what description to give of the shooter. He said, however, that he did not tell anyone what to say during the preliminary hearing.

. . . .

Metropolitan Police Department Detective Clifford Mann testified that he investigated the petitioner's case. He said his initial report indicated witness statements to the effect that the suspect "left the scene driving a white Chevrolet Celebrity with green drive-out tag in the rear window. The suspect that did the shooting go by the name of Twenty (Dollars)." He said multiple witnesses stated that the suspect and a black female got into a white car. Det. Mann said that to his knowledge, the investigators were unable to link the petitioner to either a white car or the street name "Twenty."

Christine McHenry testified that she lived with the petitioner and his family at the time of the murder. Ms. McHenry said that on the night in question, the petitioner was sick, lying on the couch. She said one of the petitioner's sisters went to the store to get him some medicine while the other one stayed with him. Ms. McHenry said she was at home the entire night. She said that when she went to bed, the petitioner was asleep on the couch and that when she awoke in the morning, the petitioner was in the same position, still asleep on the couch. She said she did not hear the petitioner leave the house during the night.

On cross-examination, Ms. McHenry said she still lived with the petitioner's mother. She said the petitioner's mother drove her to court and told her she would be testifying at the post-conviction hearing as a witness. She said she talked to the petitioner's mother the day before the hearing about the petitioner's case.

Joanne Roberson testified that she is the petitioner's mother. Ms. Roberson said that on the day of the shooting, both of her daughters and Ms. McHenry were at home. She said Ms. McHenry used to be her neighbor until Ms. McHenry's husband died. She said she let Ms. McHenry stay with her because there was no one else to take care of Ms. McHenry. Ms. Roberson said she had not attempted to influence the testimony of Ms. McHenry.

Ms. Roberson testified that she was familiar with "Twenty" because he was her grandson's father. She said "Twenty" had a reputation in the community as a violent drug dealer. She said that at the time of the murder, "Twenty" had long hair. Ms. Roberson said she was "absolutely positive" the petitioner had short hair at the time of the murder because she made him cut his hair before he moved back home. She said the petitioner cut his hair and moved back home before the murder.

Nicole House testified that she is the petitioner's sister. She said that the day of the murder was the only day her brother was sick when she also left to get him medicine. Ms. House said "Twenty" was driving a white Sunfire during the time of the murder. Ms. House testified that

at the preliminary hearing, she overheard Det. Satterfield tell Amelia Patterson, "This is what you going to get on this stand and say and this is what I need you to get up here and say." She said Det. Satterfield then gave the petitioner's description to Ms. Patterson. She said Ms. Patterson responded that she did not know the petitioner and that she would not take the stand and say that she did. Ms. House said she entered the courtroom and told the petitioner's preliminary hearing attorney about the conversation. Ms. House said that at the time of the murder, the petitioner had short hair.

Martinique Robins testified that she is the petitioner's sister. She said she also heard Det. Satterfield coaching Amelia Patterson outside the courtroom before the preliminary hearing. She said he told Ms. Patterson that the petitioner was a "light-skinned male, 120 pounds." Martinique Robins also testified concerning the reputation and hair length of "Twenty" and the type of car driven by "Twenty" similarly to Ms. House.

The petitioner testified that his attorney never discussed a line of defense with him before the trial. He said, "That's one reason I filed a complaint with the Board of Professional Responsibility . . . ." The petitioner said he wanted his attorney to file a motion to suppress the line-up identification procedures because he was "the biggest person on the photo line-up. You know, I st[u]ck out above any other dark-skinned or black male." The petitioner said that although his attorney argued a motion to suppress the line-up on the day of trial, the attorney did not raise that issue.

. . . .

The petitioner testified that his attorney never discussed with him the advantages and disadvantages of his testifying at the trial. He said the attorney only told him that if he testified, the state would bring up his prior record. The petitioner said he would have testified at the trial if he had been given the opportunity. The petitioner said his attorney never discussed his appeal with him. He said that he wanted his attorney to raise the issue on appeal about the interchange of judges but that his attorney failed to do so.

Davidson County Assistant District Attorney General Brett Gunn testified that he was assigned to prosecute the petitioner. He said that regarding the testimony of Pamela Johnson, he did not make a deal with Ms. Johnson in exchange for her testimony. He said he only told her that the district attorney's office would look at her case after the trial of the petitioner and Tabatha White. Mr. Gunn admitted that although Ms. Johnson was originally indicted for felony murder, she pled guilty to a

lesser offense after the petitioner and Ms. White were convicted and was sentenced to four years on probation.

*Id.* at \*5–9 (footnotes omitted).  The state supreme court denied Petitioner's application to appeal.  Robins filed a *pro se* habeas corpus petition in the district court, and the district court dismissed the petition on August 19, 2010.  A certificate of appealability was issued, and a timely notice of appeal was filed on August 27, 2010.

## II.

 We have jurisdiction over this appeal pursuant to 28 U.S.C. § 2253(a), which provides that a final order by a district judge in a habeas corpus proceeding "shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held."

## III.

We review *de novo* a district court's decision to grant or deny a petition for a writ of habeas corpus.  *Murphey v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009) (citing *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006)).  The provisions of the AEDPA apply here because Robins filed his initial habeas corpus petition after its enactment.  *See id.*

Under the AEDPA, a federal court may grant a writ of habeas corpus on a "claim that was adjudicated on the merits in state court proceedings" if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id.* at 407-08, or if it "either unreasonably extends or unreasonably refuses to

extend a legal principle from Supreme Court precedent to a new context," *Seymour v. Walker*, 224 F.3d 542, 549 (6th Cir. 2000).  Relief may only be awarded if a state court's application of federal law is objectively unreasonable.  *Goodell v. Williams*, 643 F.3d 490, 495 (6th Cir. 2011).  Alternatively, a habeas corpus petition may be granted under the AEDPA if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

The Supreme Court summarized the federal court's responsibility under the AEDPA in *Williams*:

> [T]he statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail.

529 U.S. at 389.

The relevant, clearly established federal law in this case was established in the Supreme Court's decision in *Strickland v. Washington*, which provides the standard for ineffective assistance of counsel under the Sixth Amendment.  466 U.S. 668 (1984).  Under *Strickland*, a defendant must establish that his or her counsel was deficient and that he or she was prejudiced by the deficiency.  *Id.* at 687.  To demonstrate deficient performance, a defendant challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  The court must apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  "Judicial scrutiny of counsel's performance must be highly deferential" because it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Id.*

A defendant must also show he or she was prejudiced by counsel's deficient performance,  and it is not enough to "show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  Instead, the challenger must show that the errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.  "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010).  "An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011).

The "pivotal question" for us on appeal, however, is "whether the state court's application of the *Strickland* standard was unreasonable," which is different from asking "whether defense counsel's performance fell below *Strickland*'s standard."  *Id.* at 785–86.  "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," and when both *Strickland* and § 2254(d) apply, the review is "doubly" highly deferential.  *Id.* at 788.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.*

IV.

Robins advanced twelve reasons why his trial counsel was ineffective.  We will examine whether the state court's application of *Strickland* was unreasonable with respect to each reason advanced.

A. Failure to Investigate and Present Witnesses at Trial

Robins argues that his trial counsel was ineffective because, though he hired a private investigator to assist in the preparation of the defense, he did not utilize the investigator's report.  Robins contends trial counsel's follow-up was deficient for three reasons: (1) he failed to call Christine McHenry as an alibi witness; (2) he failed to present witnesses who could have testified about the other suspect in the shooting,

"Twenty"; and (3) he failed to present witnesses who could testify about Petitioner's short hair at the time of the murder.

### 1. Christine McHenry

Robins argues that his trial counsel was ineffective because he failed to present testimony from Christine McHenry. Robins contends she was a crucial witness because she was the only non-family member witness subpoenaed who could have testified in support of his alibi.[1]

Trial counsel testified at the post-conviction hearing that Petitioner's main defense was alibi. *Robins*, 2006 WL 1816361, at *5. The amended notice of alibi listed four witnesses, one of whom was McHenry. *Id.* Trial counsel stated that he had intended to call McHenry, but did not because she became ill and was unavailable during trial. *Id.* At the post-conviction hearing, McHenry testified that at the time of the murder, she lived with Petitioner's mother and that the Petitioner was home when the shooting occurred. *Id.* at *8. She could not remember, though, how she knew he was home. *Id.* After reading a summary of her statement to the investigator, she remembered that Robins had been sick, was lying on the couch when she went to bed, and was still there when she awoke. *Id.* She also remembered, after her prior statement, that Robins had cut his hair prior to moving home in mid-February, 2000. *Id.* McHenry admitted, however, that she did not have a specific memory of the day. *Id.* She also testified that she was 81 years old when the case went to trial, and 86 years old at the time of the post-conviction hearing. *Id.*

The state appellate court found that the "record [did] not preponderate against the trial court's finding that the petitioner failed to prove prejudice by clear and convincing evidence"[2] because the "trial court found that Ms. McHenry was dazed and confused and

---

[1]Trial counsel's testimony at the post-conviction hearing that McHenry was Petitioner's grandmother appears to be mistaken, but McHenry did live with Robin's mother.

[2]Under Tennessee law, the burden in a post-conviction proceeding is on the petitioner to prove allegations of fact by clear and convincing evidence. *See* T.C.A. § 40-30-110(f).

that her testimony at the trial would have been merely cumulative to that of the petitioner's mother and sisters." *Id.* at \*13.

While McHenry's testimony may have strengthened Robins's alibi defense—a point which itself is debatable given McHenry's ill and elderly state—it was cumulative to the testimony given by Petitioner's mother and sister. The state appellate court's conclusion that Robins had failed to show prejudice was not unreasonable. Moreover, reasonable trial counsel could have decided that putting McHenry on the stand would be against Petitioner's interests because of her seemingly confused state. *See Jackson v. Bradshaw*, 681 F.3d 753, 761–62 (6th Cir. 2012) (finding petitioner's argument that his trial counsel failed to represent him zealously when he did not call a witness unpersuasive because counsel's decision was a "strategically defensible choice," as trial counsel did not know what the witness would say if called to the stand); *Sykes v. Wolfenbarger*, 448 F. App'x 563, 568 (6th Cir. 2006) (finding the state courts were not unreasonable in deferring to defense counsel's conclusion not to call a witness who would have testified to defendant's alibi where she was "a risky witness who might backfire"). In addition to finding Robins failed to show prejudice, the state appellate court could have also concluded Robins failed to demonstrate trial counsel was deficient. Thus, the state court's application of *Strickland* was not unreasonable.

### 2. "Twenty"

Petitioner contends trial counsel failed to present crucial witnesses who could have testified that "Twenty" fit the description of the shooter, had a violent reputation, carried a weapon, and, like the suspect, wore his hair in braids and drove a white car at the time of the shooting. Robins also asserts these witnesses could have testified that "Twenty" is Kenneth Frazier Taylor.

The police report contained references to a shooter with the nickname "Twenty." *Robins*, 2006 WL 1816361, at \*9. Roger Clemons, the private investigator retained by counsel, testified at the post-conviction hearing that he had been able to identify "Twenty" as Taylor, that he interviewed Taylor, and that he learned from his investigation that Taylor had fathered a child by Robins's sister. *Id.* at \*6. Nothing in

the record, however, linked Taylor to the scene of the crime or associated Taylor with anyone involved in the crime. *Id.* at \*14.

The state appellate court rejected Petitioner's "Twenty" argument, reasoning that trial counsel did not "pursue the avenue of defense regarding 'Twenty' more vigorously because he was focusing on presenting the petitioner's alibi as the main defense." *Id.* The court also noted that Robins did not present any evidence at the post-conviction hearing that actually linked "Twenty" to the murder, and therefore, he failed to prove prejudice by clear and convincing evidence. *Id.*

The state appellate court's decision does not contradict or unreasonably apply clearly established federal law, nor is it based on an unreasonable determination of facts. As the Supreme Court stated in *Strickland*, courts must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. A reasonable attorney could have decided that time preparing for trial was best spent on improving Robins's alibi defense, rather than searching for evidence to implicate another suspect. *See Flick v. Warren*, 465 F. App'x 461, 465 (6th Cir. 2012) (holding that trial counsel's choice to focus on aspects of the petitioner's defense other than finding a expert to challenge the science underlying shaken-baby syndrome, specifically the absence of eyewitness testimony and the petitioner's benign predisposition, was not unreasonable). There was also nothing in the record linking Taylor to the scene of the crime, and Petitioner did not offer any evidence to the contrary at the post-conviction hearing, which supports the state appellate court's conclusion that Petitioner did not show prejudice.

### 3. Petitioner's Hair Length

Petitioner argues that although several witnesses—his mother, sisters, and McHenry—were prepared to testify that his hair was cut short two weeks prior to the shooting, his trial counsel failed to ask any of these witnesses about the length of his hair at trial. This testimony was important, Robins argues, because there was evidence that the shooter had longer braided hair. The state appellate court found that Robins had

failed to prove prejudice because "the petitioner's evidence concerning his hair would have come from his alibi witnesses, whose testimony the jury rejected." *Robins*, 2006 WL 1816361, at *14.

It is possible that the jury could have found testimony given by Petitioner's mother and sisters, and McHenry, regarding the length of his hair at the time of the shooting persuasive. Given, however, that the jury found testimony by Petitioner's mother and sisters regarding his alibi unconvincing, the state appellate court's decision that the jury would have rejected their testimony about his hair as well was not unreasonable. There was mug shot evidence introduced, which is discussed further *infra* Part IV.H., that indicated the Petitioner sometimes wore his hair short, and the jury found that evidence unconvincing. Robins presented no evidence at the post-conviction hearing regarding his hair that would suggest the absence of the testimony deprived him of a fair trial. Thus, the state appellate court did not err in finding that Robins failed to prove prejudice.

### B. Pretrial Agreement Between the State and Pamela Johnson

Robins maintains that the result of his trial may have been different had his counsel filed a motion to ascertain the nature of a pretrial agreement between the State and witness Pamela Johnson, which Robins argues would have related directly to the credibility of Pamela Johnson's testimony. While the state appellate court held correctly that a *quid pro quo* existed for Pamela Johnson's testimony, Robins contends, the court erred when it held that the result of trial would not have changed had trial counsel discovered the agreement and presented it to the jury.

On direct-examination at trial, Pamela Johnson testified that she saw the shooting and knew the defendants. 2003 WL 1386835, at *2. She also testified about the victim's failure to produce drug money and about conspiring with White to detain the victim until the defendants arrived. *Id.* She denied knowing anyone had a gun, and explained that she thought that the victim would only be beaten. *Id.* She admitted lying to the police initially and at White's bond hearing because she was scared of getting hurt or having her children taken from her. *Id.* She testified that she ultimately told the police the truth

and properly identified the defendants. *Id.* Pamela Johnson's credibility was attacked again on cross-examination, when trial counsel asked her about White's bond hearing, and she confirmed she had been coerced and only a portion of her testimony had been true.

Assistant District Attorney General Brett Gunn testified at the post-conviction hearing that he promised to take Pamela Johnson's testimony into consideration when proceeding with the State's case against her. *Robins*, 2006 WL 1816361, at \*14. He also admitted that though Pamela Johnson was indicted originally for felony murder, she pled guilty to a lesser offense after Petitioner and White were convicted, and was sentenced to four years of probation only. *Id.* at \*9.

The state appellate court determined that the trial court erred when it found no deal existed between Pamela Johnson and Gunn. *Id.* Gunn's *quid pro quo*, the state appellate court explained, operated as an effective agreement. *Id.* Robins, however, failed to show that the result of his trial would have changed as a result of his attorney's failure to discover the agreement between Gunn and Pamela Johnson, and therefore, failed to show prejudice. *Id.*

Pamela Johnson's credibility was attacked, rehabilitated, and attacked again during trial on direct- and cross-examination. Trial counsel's failure to ask Pamela Johnson about additional impeaching material—the effective agreement between the State and Pamela Johnson—did not deprive Robins of a fair trial. The jury had heard sufficient testimony already to call into question Pamela Johnson's credibility as a witness. It was not unreasonable for the state appellate court to conclude that Robins failed to prove he was prejudiced by his attorney's failure to introduce yet another piece of impeachment evidence.

### C. Motion to Suppress the Photo Array

Robins next argues that trial counsel's performance was deficient because he failed to file a motion to suppress the photographic line-up until the eve of trial, and the motion filed was not prepared adequately or effectively.

The state trial court heard witnesses and argument on the motion to suppress filed by counsel and overruled the motion. The state trial court found that Petitioner suffered no prejudice from the untimely filing because it ruled on each issue raised in the motion, and ultimately denied the motion. The state appellate court agreed.

Robins lists the factors the Supreme Court has identified as relevant to an analysis assessing the reliability of an identification, but fails to analyze these factors in the context of the facts of this case or explain why trial counsel's motion to suppress was not prepared adequately or effectively. The sole reason Robins provides as to why the motion was inadequate or ineffective is that it was untimely. Despite the untimeliness of the motion, however, the state trial court heard witnesses and argument, and ruled on the motion.

As this Circuit observed in *Tankesly v. Mills*, in "cases in which we have found an attorney's performance deficient for failing to raise a particular Fourth Amendment issue, trial counsel entirely failed to lodge a Fourth Amendment challenge to the admission of evidence, and the merit of the defendant's underlying Fourth Amendment argument was obvious." No. 1-5516, 2012 WL 3195778, at *7 (6th Cir. Aug. 8, 2012) (citing *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (finding counsel's performance was deficient when he moved to suppress evidence obtained from a *Terry* stop but failed to cite on-point Supreme Court precedent with "unique factual similarities"); *Northrop v. Trippett*, 265 F.3d 372, 382 (6th Cir. 2001) (finding counsel's performance was deficient where he failed to file a motion challenging a seizure when the defendant was detained by officers based on an unverified anonymous tip and the officers had no other basis for stopping the defendant)).

Robins must show both deficiency and prejudice under *Strickland*. He has failed to advance any persuasive arguments as to why his counsel's performance was deficient, and has also failed to show prejudice because the trial court ruled on his motion. Unlike in *Joshua*, Petitioner has pointed to no persuasive precedent with facts similar to the facts of this case, and unlike in *Northrop*, counsel filed a motion to suppress that was

ruled on by the trial court.  Thus, the state appellate court's application of federal law was not unreasonable.

### D. Identity of Crime Stoppers Confidential Informant

Petitioner's next argument is that trial counsel was ineffective because he failed to file a motion to ascertain the identity of the Crime Stoppers confidential informant, even though Petitioner requested counsel do so.  Robins argues that the confidential informant was either a participant or witness to the crime because "[t]here is no other logical reason to name a suspect, unless it was to divert attention away from the caller, in which case the disclosure would have definitely been relevant and beneficial to the presentation of the defense and would have thus been essential to a fair trial."  Petitioner Br. at 39.

The state trial court found that Robins failed to prove prejudice because "he failed to introduce any evidence showing how the identity of the caller would have helped his defense." *Robins*, 2006 WL 1816361, at *15.  The state appellate court found that the record supported the trial court's finding and that Robins was not entitled to relief. *Id.*

Under Tennessee law, the identity of a confidential informant is generally privileged. *Tennessee v. Vanderford*, 980 S.W.2d 390, 395 (Tenn. Crim. App. 1997). The privilege is predicated upon public policy concerns, and "seeks to encourage citizens to assist in crime detection and prevention by giving information to law enforcement officials without unduly exposing themselves to the danger inherent in such laudable activity." *Id.* (citing *Roberts v. Tennessee*, 489 S.W.2d 263, 263 (Tenn. Crim. App. 1972)).  The privilege is not absolute, though, and the State is required to divulge the identity of a confidential informant to the defendant when: (1) disclosure would be relevant and helpful to the defendant in presenting his defense and is essential to a fair trial; (2) the informant was a participant in the crime; (3) the informant was a witness to the crime; and (4) the informant has knowledge which is favorable to the defendant. *Id.* at 397 (citations omitted).  The defendant, as the movant for the disclosure, "has the burden of establishing by a preponderance of the evidence that the identity of the

confidential informant is material to his defense because the informant was a witness to the crime, participated in the crime, or possesses facts favorable or relevant to the defendant." *Id.* (citations omitted).

Robins failed to present any evidence indicating that a motion to ascertain the identity of the confidential informant would have been granted under Tennessee law. Rather, he urges us to infer that the confidential informant was either a participant in or a witness to the crime because "[t]here is no other logical reason to name a suspect." Petitioner Br. at 39. If the Court were to make the requested jump in logic, Tennessee precedent requiring the movant to establish, by the preponderance of the evidence, that materiality of the identity of the confidential informant would be rendered meaningless. Without providing any evidence indicating that a motion to ascertain the confidential informant's identity would have been granted, Robins has failed to show prejudice. The state appellate court's decision was not unreasonable.

## E. Testimony of Harold Overton

Robins argues trial counsel was deficient because he failed to object to what Robins contends was prejudicial hearsay testimony given by Harold Overton. Robins also argues that trial counsel failed to object when the prosecution "misquoted Mr. Overton, saying that Mr. Overton heard the person saying that the *police* were looking for Leon [Robins]" during closing argument.[3] Petitioner Br. at 39 (emphasis in original).

Overton testified about a conversation he overheard from his apartment building between Robins and two or three other men. *See supra* Part I.A. Overton testified that when one guy told Robins "they are looking for you," Robins responded "well, I don't give a fuck, you know, there is more than one Leon . . . besides that, they don't know my last name." *Robins*, 2003 WL 1386835, at *3. The state appellate court held that the

---

[3]Robins also contends that "[t]he fact that someone is looking for someone named Leon is simply irrelevant." Petitioner Br. at 41. Presumably he is arguing that his counsel should have objected to Overton's testimony on relevance grounds. Under Tennessee Rule of Evidence 401, "relevant evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The fact that Robins was warned that someone was looking for him, and then that he replied he did not care and that they did not know his last name, has a tendency to make his guilt more probable. Petitioner's relevance argument is unpersuasive as Overton's testimony is clearly relevant.

"statements were admissible as party opponent admissions and that the record support[ed] the trial court's finding that the petitioner's attorney's performance was not deficient." *Robins*, 2006 WL 1816361, at \*16.

Tennessee Rule of Evidence 803(1.2) mirrors Federal Rule of Evidence 801(d)(2) and provides that "[a] statement offered against a party that is (A) the party's own statement in either an individual or a representative capacity" is not excluded by the hearsay rule. The statement made by Robins in response to the comment made by one of the men outside of the apartment building that someone was looking for him could, indeed, qualify as a party-opponent admission. The statement alerting Robins to the fact that someone was looking for him, however, was not a party-opponent admission because the person who offered it is not a party. The state courts erred when they failed to parse Overton's testimony in this manner. Yet, even if they had parsed Overton's testimony, and an objection to the statement made by the third-party had been sustained, the testimony about Robins's reply could have been admitted as a statement by a party-opponent. This admission by Robins was the harmful portion of Overton's testimony. Even without the context of the question to which Robins was responding, Robins's statement implied some culpability because he indicated he was confident he would not be discovered.

The state trial court's inquiry was whether the deficiencies at trial were "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. While trial counsel could have been more cautious when Overton was testifying and made a hearsay objection, or objected to the prosecution's mischaracterization of Overton's testimony during closing argument, counsel's performance was not deficient. *See Meadows v. Doom*, 450 F. App'x 518, 523 (6th Cir. 2011) ("While trial counsel could undeniably have been more vigilant in objecting to statements made by Dr. Compton and could have done a more thorough investigation of witnesses prior to trial, our review of the trial in its entirety convinces us that these shortcomings were not 'so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment.'") (citing *Strickland*, 466 U.S. at

687); *see also Jackson*, 681 F.3d at 763 (finding that petitioner failed to demonstrate that he was denied a fundamentally fair proceeding because his trial counsel failed to object to the prosecution's use of leading questions during direct-examination). Moreover, Robins makes no argument as to *how* counsel's failure to object was so prejudicial that he was deprived of a fair trial. The state appellate court's finding that the state trial court did not err was not unreasonable.

### F. Complaint Filed with Board of Professional Responsibility

Robins filed a complaint against his trial counsel with the Board of Professional Responsibility. He argues counsel acted deficiently by failing to bring the complaint to the court's attention prior to trial and by failing to address the concerns set forth in the complaint.

The state appellate court concluded that Robins failed to prove prejudice because he "fail[ed] to allege in his brief how his attorney's failure to bring this matter to the attention of the court prejudiced his defense." *Robins*, 2006 WL 1816361, at *16. This conclusion was not unreasonable because Petitioner does not elaborate on how his defense was prejudiced by counsel's failure to advise of the complaint. Robins does not provide any information about the content of his complaint. We can reach no conclusion other than that the state appellate court did not err.

### G. Cross-Examination of Amelia Patterson and Pamela Johnson

Robins argues trial counsel failed to cross-examine Amelia Patterson and Pamela Johnson adequately and effectively. With respect to Amelia Patterson, Robins argues counsel was deficient because he failed to ask Patterson about Detective Satterfield coaching her on the description of the shooter in the case prior to the preliminary hearing. Robins contends trial counsel's cross-examination of Pamela Johnson was deficient because he did not ask her about "her motive to lie." Petitioner Br. at 42. Robins asserts Pamela Johnson had this motive because she was charged with first-degree murder in the same case.

With respect to trial counsel's cross-examination of Patterson, the state appellate court found that Robins failed to prove that Detective Satterfield coached Patterson because Robins's counsel failed to call Patterson to testify at the post-conviction hearing, and Detective Satterfield testified that he did not coach Patterson. *Robins*, 2006 WL 1816361, at \*16. The trial court credited Detective Satterfield's testimony. It was not unreasonable for the state appellate court to conclude that trial counsel's performance was not deficient where Robins failed to prove Patterson had been coached.

With respect to Pamela Johnson's motive to lie, the state trial court found that while the Petitioner's trial counsel's cross-examination could have been more explicit, the jury was aware of Pamela Johnson's indictment for murder, and trial counsel gave the jury appropriate instructions about her credibility. *Id.* The state appellate court concluded, in light of this reasoning, that Petitioner failed to show prejudice. *Id.*

"When deciding whether counsel's errors prejudiced a defendant, we must consider the totality of the evidence before the . . . . jury." *Jackson*, 681 F.3d at 760 (citing *Strickland*, 466 U.S. at 695). Because the jury was aware that Pamela Johnson was under indictment for the murder, Robins failed to show how "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. While explicitly questioning Pamela Johnson about her indictment on cross-examination may have helped strengthen Robins's case, evidence and testimony had already been presented that called into question Johnson's credibility. The state appellate court's decision that Robins failed to show prejudice was not unreasonable.

## H. Petitioner's Mug Shots

Robins next contends that trial counsel was ineffective because he requested that numerous mug shots of Robins be admitted into evidence during trial, and then failed to request curative instructions. Robins claims that although he demanded that the mug shots be introduced to contest evidence offered by the prosecution, the decision was ultimately at the exclusive prerogative of trial counsel, and the pictures "clearly painted a picture of Petitioner as a dangerous criminal with a lengthy arrest history." Petitioner

Br. at 46. "Without curative instructions from the court as to the limited way in which the jury was to use these photographs, it is clear that the jury could and did, conclude that the Petitioner was the type of person who would commit this horrible act." *Id.*

The State introduced three mug shots during trial to demonstrate that Petitioner wore his hair long in the past. *Robins*, 2006 WL 1816361, at *17. In response, trial counsel sought to introduce nine other mug shots of the Petitioner with short hair. *Id.* A bench conference ensued where trial counsel informed the court that his client demanded he submit the pictures into evidence. *Id.* The court advised counsel that he did not have to adhere to his client's demand if he did not think it was a good idea, to which counsel replied: "Well, it's a good idea." *Id.*

The state appellate court denied Petitioner post-conviction relief, reasoning:

> We conclude the petitioner has failed to prove by clear and convincing evidence that he was prejudiced as a result of his attorney's introducing the mug shots into evidence. Although the introduction of the nine mug shots allowed the jurors to consider that the petitioner had been previously arrested, the state had already introduced three mug shots which would have allowed the jurors to draw a similar conclusion. Moreover, various witnesses at the trial identified the petitioner as the shooter, and Ms. Johnson testified to the events leading up to the killing. The petitioner is not entitled to relief on this issue.

*Id.*

In addition, the trial court, on the record, explained the various considerations that go into providing curative jury instructions:

> [Trial counsel], if you want me to instruct the jury either contemporaneously or at the end of the trial that the jury—I'll be glad to instruct the jury that they are to infer, you know, they are not to infer guilt or any other prior bad conduct from the fact that the police have in their possession photographs. Now I know sometimes defense counsel has to make a call. Well, it is better just to let it go unsaid because it might emphasize it, but I am making an offer to you.

3:07-cv-00429, Dkt. 58-3 at 197.

While trial counsel's decision[4] to introduce nine mug shots, in hindsight, may appear a lapse of judgment, his decision was a tactical one, and the state appellate court's application of *Strickland* was not unreasonable.  Trial counsel made a strategic choice because he thought that it was important to produce pictures of Petitioner with short hair. Given the state trial court's insights regarding jury instructions, trial counsel may have also made a tactical choice not to provide curative jury instructions to avoid drawing further attention to the fact that the pictures were mug shots.  "[S]trategic choices made after thorough investigation of law and fact relevant to plausible options are virtually unchallengeable." *Strickland*, 466 US. at 690.  Moreover, we must consider the totality of the evidence before the jury, and as the state appellate court noted, various witnesses testified that Robins was the shooter.  *Robins*, 2006 WL 1816361, at *17.  The state appellate court's decision on the mug shots and lack of curative instructions was not unreasonable.

## I. Offer of Proof on "Twenty"

Petitioner contends trial counsel was deficient because he failed to present an offer of proof or other evidence on the issue of other suspects, specifically, "Twenty," whose real name is Kenneth Frazier Taylor.  When considering this argument at the post-conviction hearing, the state trial court noted that Robins had failed to produce any admissible evidence indicating that "Twenty" was the killer, and that there was no evidentiary support for Petitioner's speculation.  While the Petitioner was able to put witnesses on the stand who testified that Taylor was sometimes seen driving a white car, and that a white car was seen leaving the scene of the shooting, Petitioner could not produce proof that there was any relationship between White and Taylor.  Nor could Robins produce a single witness that identified Taylor as the killer, or that put Taylor at the scene of the crime.

The state appellate court agreed with the trial court, finding that "the record is devoid of any substantive evidence linking 'Twenty' to the killing," and therefore,

---

[4]Petitioner's argument that trial counsel adopted his demand to introduce the pictures is unpersuasive.  The record reflects that trial counsel ultimately thought introducing the pictures was "good idea" and made the decision to do so on his own volition. *Robins*, 2006 WL 1816361, at *17.

Petitioner "failed to prove by clear and convincing evidence that he was prejudiced by his attorney's failure to put forth an offer of proof that 'Twenty' was the killer." *Robins*, 2006 WL 1816361, at \*17.

Without proof that Taylor was the killer, Robins cannot argue that he was deprived of a fair trial because of trial counsel's failure to present an offer of proof or other evidence related to Taylor. The prosecution presented witnesses who identified Robins as the shooter. There was not one witness who could testify that Taylor was the shooter; rather, Petitioner merely pointed to witness testimony that Taylor sometimes drove a white car and had a violent reputation. The state appellate court's finding that Petitioner was not prejudiced by trial counsel's failure to offer proof or other evidence related to "Twenty" was not unreasonable.

### J. Evidence of Detective Satterfield's Coaching of Amelia Patterson

Petitioner contends trial counsel was ineffective when he failed to introduce evidence of Detective Satterfield's coaching Patterson, even though the coaching issue was brought to trial counsel's attention before the preliminary hearing in this case. The record indicates that at the post-conviction hearing, Clemons testified that as a part of his investigation, he learned that Detective Satterfield coached Patterson before she testified. *Robins*, 2006 WL 1816361, at \*7. Detective Satterfield testified that he did not recall coaching Patterson as to what description to give the shooter, and that he did not tell anyone what to say during the preliminary hearing. *Id.* One of Robins's sisters, Nicole House, testified at the post-conviction hearing that she overhead Detective Satterfield coaching Patterson. *Id.* at \*8.

As noted *supra* Part IV.G., Petitioner did not call Patterson to testify at the post-conviction hearing. Given this lack of testimony, and Detective Satterfield's testimony that he did not coach Patterson, which the state trial court found persuasive, the state appellate court concluded that Petitioner had failed to prove coaching. *Robins*, 2006 WL 1816361, at \*18. It follows that if Robins failed to prove witness coaching, then he also failed to prove his counsel's performance was deficient for failing to prove witness

coaching, or that he was prejudiced as a result. *Id.* For reasons similar to those already articulated in Part IV.G, the state appellate Court's finding was not unreasonable.

K. Trial Counsel's Discussions With Petitioner About His Right to Testify

Petitioner argues trial counsel acted deficiently when he failed to advise Petitioner of his right to testify and of the advantages and disadvantages of testifying. Petitioner argues that his testimony was "crucial to his case" because, *inter alia*, "[n]o other witness had testified about [his] hair length at the time of the shooting" and he "would have testified to his alibi and could have testified about the alternative suspect, 'Twenty.'" Petitioner Br. at 52–53. To support his argument, Petitioner relies on a Tennessee Supreme Court case, *Momon v. Tennessee*, which discusses a criminal defendant's right to testify, and once it has been established the right has been violated, the factors for courts to consider when determining whether denial of the right was harmless beyond a reasonable doubt.[5]  18 S.W.3d 152 (Tenn. 1999).

At the post-conviction hearing, trial counsel testified that he could not specifically remember discussing with Robins his right to testify and the advantages and disadvantages of testifying, but that he discusses those issues with all of his clients as a matter of course. When asked about the advantages and disadvantages of putting Robins on the stand, trial counsel explained that "the disadvantage would be that he would be subjecting himself to cross-examination," and the "statements that Harold Overton testified to that he could be asked about." 3:07-cv-00429, Dkt. 58-5 at 73. He also noted that Robins's "general demeanor was not advantageous to an extent where testifying in front of a jury would be something that I considered in his best interest." *Id.*

In denying Robins relief on this ground, the state appellate court reasoned:

In *Momon,* our supreme court mandated certain procedures be employed to ensure that a defendant personally waive his right to testify but stated,

---

[5]The factors listed in *Momon* include: "(1) the importance of the defendant's testimony to the defense case; (2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the witness on material points; and (4) the overall strength of the prosecution's case." *Id.* at 167–68.

> The procedures are prophylactic measures which are not themselves constitutionally required.  As such, the procedures adopted herein do not establish a new constitutional rule which must be retroactively applied . . . . [M]ere failure to follow these guidelines will not in and of itself support a claim for deprivation of the constitutional right to testify if there is evidence in the record to establish that the right was otherwise personally waived by the defendant.

> 18 S.W.3d at 163. . . . The trial court accredited the testimony of the attorney over the petitioner and found that the attorney did discuss the petitioner's right to testify with him. We conclude the petitioner has failed to establish any constitutional violation, and he is not entitled to relief on this issue.

*Robins*, 2006 WL 1816361, at *18.

Evidence was presented at the post-conviction hearing that trial counsel did in fact advise Petitioner of his right to testify.  The state trial court found that evidence more persuasive than Robins's contention that he was not advised of his rights.  The state appellate court's decision was not based on an "unreasonable determination of the facts in light of the evidence presented."  *See* 28 U.S.C. § 2254(d)(2).  It was unnecessary for the state appellate court even to consider the *Momon* factors because no constitutional violation was found.[6]  The state appellate court's decision was not unreasonable.

### L. Failure to Object to Alibi Jury Instruction

Robins contends that trial counsel was deficient because he failed to object to an improper and unconstitutional jury instruction regarding alibi.  Relying on *Christian v. Tennessee*, 555 S.W.2d 863, 865 (Tenn. 1977), Petitioner argues that the last line of the jury instruction on the defense of alibi was unconstitutional, which read as follows: "The

---

[6]We note that even if it had been necessary to apply the factors it is unlikely Robins would have been successful, as his testimony would have been cumulative in nature because his main defense was alibi and he had three alibi witnesses testify.  There was testimony already given at trial both corroborating and contradicting Robins's proposed testimony on material points.  These facts indicate Robins's proposed testimony was not of extreme importance to the defense's case.  Furthermore, the prosecution's case was already strong because multiple witnesses had testified that Robins was the shooter.  *See Momon*, 18 S.W.3d at 167.

weight to be given to alibi evidence is a question for the jury to decide considering all the facts and circumstances of the case." Petitioner Br. at 56.

The state appellant court addressed this argument:

> In *Christian,* the trial court's alibi instruction concluded, "The law says that the defense of alibi should be received by the jury discreetly and cautiously because it is a defense that can be easily manufactured or fabricated." 555 S.W.2d at 864. Our supreme court held that a trial court "should not disparage alibi evidence or instruct the jury to treat it differently from evidence offered on other issues" or "instruct the jury as to any special method of weighing or receiving alibi evidence . . . ." *Id.* at 865. The petitioner claims the trial court violated *Christian.*

> We disagree and conclude the petitioner has misapprehended *Christian's* applicability to his case. The trial court did not comment on the weight of the evidence in the present case. It merely informed the jury that it was the jury's exclusive prerogative to determine the weight. We conclude the petitioner's attorney was not deficient in failing to object. We also conclude the petitioner has failed to introduce any evidence of how this attorney's failure to object resulted in prejudice. The petitioner is not entitled to relief on this issue.

*Robins*, 2006 WL 1816361, at *19.

We agree with the state appellate court that it was unnecessary for trial counsel to object to the alibi jury instruction, as it instructed the jury "generally on alibi" rather than "as to any special method of weighing or receiving alibi evidence." *See Christian*, 555 S.W.2d at 865. Trial counsel performance was not deficient, and the state appellate court did not unreasonably apply *Strickland*.

## M. Cumulative Errors

Petitioner's final argument is that "the cumulative effect of trial counsel's deficient performance prejudiced Petitioner and warrants a new trial on these charges." Petitioner Br. at 56. This argument is meritless in light of our findings above that the state appellate court did not unreasonably apply *Strickland*.

V.

For the foregoing reasons, we AFFIRM the district court's decision denying Petitioner's habeas corpus petition.